[No. 53376–8.   En Banc.   April 4, 1991.]

RUDOLPH BABCOCK, ET AL, *Appellants,* v. THE STATE OF WASHINGTON, *Respondent.*

Michael R. Seidl, Bullivant, Houser, Bailey, Pendergrass & Hoffman, Robert J. Crotty, and Lukins & Annis, for appellants.

Kenneth O. Eikenberry, Attorney General, Owen F. Clarke, Senior Assistant, and Michael E. Grant, Assistant, for respondent.

UTTER, J.—In Babcock v. State, 112 Wn.2d 83, 768 P.2d 481 (1989) (hereinafter Babcock I), this court granted the Washington Department of Social and Health Services (DSHS) and its caseworkers absolute immunity from liability for negligent foster care investigation and placement. We granted a motion to reconsider Babcock I because its legal conclusions were based upon a factual error. We now conclude that the caseworkers are not absolutely immune from suit for negligent foster care placement and reverse the trial court decision granting the caseworkers and DSHS immunity from suit.

## I

■■ This tort suit involves allegations flowing from the placement of several young girls with a relative, Lee Michael, who raped them.[1] Because the trial court disposed of the case on a motion for summary judgment, we may only affirm if no issues of material fact exist. CR 56(c); Hartley v. State, 103 Wn.2d 768, 774, 698 P.2d 77 (1985). This rule prevents courts from assuming the function of a jury by weighing the facts as presented in documents prior to trial. See Palmer v. Waterman S.S. Corp., 52 Wn.2d 604, 608–09, 328 P.2d 169 (upholding denial of summary judgment when facts were at issue), cert. denied, 359 U.S. 985

---

[1]Michael was married to Janet Michael, who was the sister of Rudolph Babcock's deceased wife, Ann. Thus, Lee Michael was the maternal uncle by marriage of the four girls DSHS placed with him.

(1958). Summary judgment exists to examine the sufficiency of legal claims and narrow issues, not as an unfair substitute for trial. *See Graves v. P.J. Taggares Co.*, 94 Wn.2d 298, 302–03, 616 P.2d 1223 (1980) (summary judgment only appropriate when facts are susceptible to only one interpretation). Accordingly, we construe facts in the light most favorable to the nonmoving party in reviewing a motion for summary judgment. *Wendle v. Farrow*, 102 Wn.2d 380, 383, 686 P.2d 480 (1984).

In this case, most of the facts are undisputed. However, the plurality's previous opinion erroneously construed at least one disputed fact in favor of the State as the moving party. *Compare Babcock* I, at 85 (Aryn ran away from her grandparents' home twice) *with* Reply Brief of Appellants Rudolph Babcock, Beth Babcock, Erika Babcock, and Angela Long, at 6–7. The plurality's previous opinion also erroneously presented the undisputed facts in the light most favorable to the State as moving party instead of in the light most favorable to the nonmoving party as required by our case law. There was, in addition, a critical factual error which forced us to reconsider our previous decision: the mischaracterization of the juvenile court proceedings which confirmed the caseworkers' placement decisions. All of these errors are corrected in this opinion.

Rudolph Babcock married Ann Babcock in 1970. In 1970, Ann Babcock already had two daughters from a previous marriage to Dan Long, Angela Long, aged 3, and Aryn Long, aged 2. The marriage between Rudolph and Ann produced two more daughters, Erika and Beth Babcock.

In 1978, Ann Babcock committed suicide in Louisiana, where the family had moved earlier that year. In July 1981, a Louisiana court determined that the children were in need of care. Exhibit 2, at 325–26. The Louisiana court held a 4–day adjudicatory and dispositional hearing during which the court indicated that Lee Michael, who was present, could not have custody of the children. Exhibit 2, at 432–35. The court issued an order placing the children with Rudolph Babcock's parents, Elizabeth and Willis

Babcock of Richland, Washington. On August 25, 1981, Washington's Department of Social and Health Services agreed to supervise the Babcock placement pursuant to an interstate compact. *See* RCW 26.34.

On August 31, 1981, Michael visited caseworker Tyler at the DSHS office. Clerk's Papers, at 3585. Tyler made a note in the service record kept by caseworkers to complete a home study of the Michael and Babcock homes. Clerk's Papers, at 3586. On October 2, 1981, DSHS was notified that Michael had taken Aryn Long to the residence of his sister–in–law. Clerk's Papers, at 3392, Admission 4. Later that evening DSHS placed Aryn in 72–hour protective custody at the Michael residence. Clerk's Papers, at 3392–93, Admissions 5–7. On October 6, 1981, an attorney representing DSHS requested that their counterparts in Louisiana obtain an order from Louisiana relinquishing jurisdiction to Washington, subject to acceptance by the Washington court. Clerk's Papers, at 3463. The next day the Louisiana Department of Health and Human Resources obtained orders from the Louisiana court relinquishing jurisdiction and requiring Rudolph to leave his parents' home where he had been residing with his children. Clerk's Papers, at 3463.

On October 16, 1981, DSHS again took Aryn from her grandparents' home with Michael's assistance. Clerk's Papers, at 3395, Admission 17. DSHS first placed Aryn in a foster home and 2 or 3 days later moved her to the home of Marilyn Wallace, a friendly neighbor of Michael.[2] Clerk's Papers, at 3398–99, 3563. Aryn Long's deposition indicates that Michael may have begun sexually abusing her while she was at the home of Marilyn Wallace, before DSHS

---

[2]The plurality opinion in *Babcock* I contained an apparent error with respect to the events in October. That opinion states that Aryn Long ran away twice in October. *Babcock* I, at 85. The pages cited in the Brief of Respondent do not support this assertion. DSHS prepared a document in January 1982, 3 months after Aryn supposedly ran away, which said she had run away from the Hanford School on October 2, not from home. Clerk's Papers, at 3533. DSHS may be able to establish this fact at trial. But we cannot construe disputed factual allegations unsupported in the record in favor of the moving party in reviewing a motion for summary judgment.

secured a court order placing her with Lee Michael.[3] On November 4, 1982, caseworker Tyler entered a notation in the service record indicating she planned to recommend placement of Angela and Aryn Long with Lee Michael. Clerk's Papers, at 3601–02.

On November 5, 1981, the juvenile division of Benton County Superior Court accepted jurisdiction in an ex parte proceeding. On December 3, 1981, DSHS placed Angela Long with Marilyn Wallace without providing either Rudolph Babcock or the grandparents with notice or a hearing. Clerk's Papers, at 3396–97, 3403, 3405.

On January 8, 1982, Tyler prepared a document labeled "Court Summary and Agency Plan" which recommended placement at the Michael home. In preparing this document, Tyler never asked anyone whether Michael had a criminal background. In fact, Michael had a criminal record dating back to 1967 which included charges of forcible rape, sexual assault, and attempted rape.

In February 1982, Rudolph Babcock took the two remaining girls, Erika and Beth, with him to Wisconsin. DSHS obtained a warrant for Rudolph's arrest on custodial interference charges and an ex parte order of requisition for the return of the Babcock girls through interstate compact procedures. The arrest warrant was later quashed.

On March 30, 1982, the Benton County juvenile court conducted a dependency review hearing pursuant to former RCW 13.34.130(3) (in effect in 1987).[4] *Babcock* I mischaracterized this hearing and several others as dispositional hearings. *Babcock* I, at 86–87. Dependency review hearings determine whether court supervision of a child will continue. Former RCW 13.34.130(3). Dispositional hearings, on the other hand, establish where children being removed from their parents will be placed and what services will be

---

[3]Aryn Long is not a party to this lawsuit, but her step–father, Rudolph Babcock, and his parents, with whom she also lived, are parties.

[4]This section of the statute has been amended in the years since the placement at the Michael home was made.

required. RCW 13.34.110, .120.[5] At this dependency review hearing, DSHS submitted a copy of caseworker Tyler's home study report on the Michaels which recommended placing Angela and Aryn at the Michael home. The court accepted the caseworker's recommendation without reading the home study report, accepting evidence, or delaying action until Rudolph Babcock, who had raised the Long girls, returned from Wisconsin. Clerk's Papers, at 3488, 3498.[6] A Wisconsin court remanded Rudolph Babcock's natural daughters, Erika and Beth, to the custody of the Washington DSHS on April 14, 1982.

The caseworkers placed Erika and Beth Babcock first with Michael's sister–in–law, Sandra Hanson, and then, 2 days later, with Lee Michael. Clerk's Papers, at 3407. They placed these children with no court order authorizing this placement and without providing Rudolph Babcock with notice or an opportunity to be heard. Clerk's Papers, at 3408, 3435.

On May 4, 1982, the juvenile court attempted to hold another dependency review hearing. Because the Louisiana court had failed to produce any findings of fact and conclusions of law or a transcript of the 1981 dispositional hearing, the juvenile court continued the review hearing to permit the issue of the girls' dependency to be fully addressed. The court ordered that all of the girls were to

---

[5]Placement is not among the functions of the dependency review hearing listed in the statute. See former RCW 13.34.130(3). By contrast, the Legislature has designed the dispositional procedure specifically to make placement decisions and included important procedural protections for parents in that procedure. See RCW 13.34.110, .120. The adequacy of these protections is relevant to the immunity questions raised in this case.

By making this distinction we do not wish to question the judge's authority to change a placement during a dependency review hearing. See RCW 13.34.150. The legality of the court order is not at issue. Babcock v. State, 112 Wn.2d at 92–94. Nor do we decide, on this appeal, whether DSHS had a legal obligation to initiate a Washington dependency under RCW 13.34.110–.120 as alleged by the Babcocks. This issue will be relevant only if the caseworkers raise a qualified immunity argument on remand.

[6]The girls' natural father, Dan Long, consented to the placement.

remain at the Michaels', where DSHS had placed them, until the next hearing.

The juvenile court commissioner held a full dependency review hearing on August 26 and 27, 1982. At that hearing, all parties were represented by counsel. The court heard testimony from the girls' therapists, social service caseworker Bronson, a family counselor, Lee and Janet Michael, and Rudolph Babcock. At the end of the hearing the court did not terminate the dependency, but instead ordered the girls to remain with the Michaels. The court held several subsequent dependency review hearings.

In October 1983, it was discovered that Lee Michael had sexually abused the four girls, as well as his own daughter. Lee Michael was subsequently convicted of three counts of statutory rape and two counts of indecent liberties and sentenced to 55 years in prison.

Because this opinion addresses the caseworkers' claims to absolute immunity based on the alleged intimate connection between their actions and the judicial process, the facts relevant to this issue must be discussed at the outset. Caseworker Tyler never appeared in any judicial proceeding at any time and the trial court did not enter the home study she prepared into evidence. Caseworker Bronson did not appear in court until the August 26–27 dependency review hearing held after the girls had been placed with Michael. Neither caseworker ever filed a petition to establish a dependency. The caseworkers made placements of all these children with parties connected to Michael without prior authorization of a court. DSHS secured court orders authorizing placement of Erika and Beth with Michael after physically placing them with Michael but before the abuse began. It secured court orders authorizing Aryn and Angela's placement with Michael before actually moving them there but after Michael began abusing Aryn. DSHS obtained all of these court orders during the course of dependency review hearings, not dispositional hearings.

## II

Rudolph Babcock, his parents, Beth, Erika, and Angela Long filed suit in state and federal courts seeking damages against the State and the individual caseworkers for negligence, outrage, alienation of affections, and violation of their civil rights. *See* 42 U.S.C. § 1983. The complaint alleged that DSHS's actions in this case violated the Louisiana court order, the Department's rights and responsibilities under the compact with Louisiana, and the department's statutory obligations to reunite the Babcock family. The trial court granted the State's motion for summary judgment. The trial court held that the complaint failed to state a claim for alienation of affections or outrage. It also held that qualified immunity certainly shielded the caseworkers and DSHS and commented that absolute immunity might apply as well. Finally, it ruled that the juvenile court proceedings occurring prior to this tort suit barred this action through res judicata and collateral estoppel. The Babcocks[7] only appealed the state law claims to this court, and pursued their federal claims in federal court. We therefore consider only the state court claims in this opinion.

This court affirmed the trial court's dismissal of the Babcocks' claims in *Babcock* I. It held that the absolute immunity granted participants in judicial processes shielded the caseworkers and DSHS from liability. Moreover, it held that the complaint did not state a cause of action for alienation of affections or outrage. On the other hand, the court rejected DSHS's res judicata and collateral estoppel arguments. We granted a motion to reconsider our decision in *Babcock* I because the plurality opinion stated and relied upon erroneous facts.

The plurality's decision in *Babcock* I stated that the juvenile court had ordered DSHS to place the four children

---

[7]"The Babcocks" is used to refer to all of the plaintiffs, Rudolph Babcock, Willis Babcock, Elizabeth Babcock, Beth Babcock, Erika Babcock, and Angela Long.

in Michael's care pursuant to the procedure for court approval of placement decisions, a type of disposition under RCW 13.34.110. *See Babcock* I, at 86–87.

If DSHS had used Washington's disposition procedure, it would have completed and filed a predisposition study. *See* RCW 13.34.120. The parents would be entitled to a hearing if they disagreed with the disposition. RCW 13.34.110. The court would have then entered an order placing the child. *See* RCW 13.34.130(1)(b).

The court did none of this because the Louisiana court had completed the dispositional phase of the process, ordering the children to live with their grandparents in Washington. Washington's juvenile court never adjudicated the question of foster care placement. Because of this, DSHS never brought a petition before the court or presented a predisposition study.

The juvenile court never formally reviewed DSHS's placement decision. Indeed, DSHS has taken the position in this lawsuit that its custody over the girls gave it the power "to make such placements as were necessary." Brief of Respondent, at 29.

The juvenile court did, however, conduct review hearings concerning the children. It tried to fulfill its statutory responsibility to review the children's "dependency" status. During the course of these hearings it issued orders allowing DSHS's placement decisions to stand.

Dependency review does not focus upon the correctness of DSHS's placement decisions. It focuses on the question of whether the children's "dependency" continues and the issue of whether the children can return to their parents, in this case, Rudolph Babcock. *See* former RCW 13.34.130(3). Review hearings determine issues such as visitation rights, parental cooperation with DSHS, and whether additional services are required. *See* former RCW 13.34.130(3)(b).

After this court issued the decision containing this important factual error, the Ninth Circuit concluded that the caseworkers were entitled to absolute immunity under the federal civil rights statute, 42 U.S.C. § 1983. The Ninth

Circuit, apparently relying on the plurality in *Babcock* I, mistakenly stated that the hearings were dependency disposition hearings. *See Babcock v. Tyler*, 884 F.2d 497, 499 (9th Cir. 1989), *cert. denied*, 110 S. Ct. 1118 (1990).[8]

## III

In reviewing the trial court's decision, we confine ourselves to the issues the parties have raised and which the trial court considered. *See* RAP 12.1(a); *State v. Hubbard*, 103 Wn.2d 570, 573–74, 693 P.2d 718 (1985) (Court of Appeals reversed because it decided an issue not raised). Our role is not to determine whether the caseworkers' action constituted actionable negligence. The questions concerning whether the caseworkers were negligent have not yet been decided at trial.

■ We must decide whether the absolute immunity granted judges under state common law should extend to caseworkers. The Legislature has already chosen to deny caseworkers absolute immunity. In addition, binding state precedent and federal precedent under 42 U.S.C. § 1983 show that the common law does not support absolute immunity from tort liability for negligent foster care investigation and placement in this case.

Absolute immunity shields the recipient from liability for willful misconduct as well as negligence. A caseworker cloaked in absolute immunity could deliberately arrange a foster care placement with a known rapist in order to facilitate the sexual abuse of a child and escape tort liability. This should not be the law.

Were we to grant caseworkers an absolute immunity for foster care placement decisions, we would create a situation

---

[8]The Ninth Circuit decision also erroneously states that the sexual abuse occurred after a court order was issued confirming the placement of the children with Michael. *Babcock*, 884 F.2d at 504. The record shows, however, that Michael abused Aryn Long prior to the order. Clerk's Papers, at 1913. The Ninth Circuit opinion apparently copied some questionable factual statements verbatim from our first *Babcock* opinion without citation. Compare *Babcock*, 884 F.2d at 503 n.6, *with Babcock*, 112 Wn.2d at 85.

where caseworkers who often must act hurriedly in removing children from abuse receive a qualified immunity, while those making placement investigations receive absolute immunity. RCW 26.44.056 allows DSHS to detain a child until a court assumes custody for up to 72 hours if it has "reasonable cause to believe" that leaving the child in his or her residence "would present an *imminent danger* to that child's safety". (Italics ours.) RCW 26.44.056.

The same section of the statute creates an immunity for caseworkers. This immunity applies to a "child protective services employee" taking a child into custody, "*if done in good faith under this section.*"[9] (Italics ours.) RCW 26.44-.056(3). Thus, even in the area of emergency removal of children from child abuse, the Legislature has only granted caseworkers qualified immunity.

The Legislature has passed no statute directly governing caseworker immunity for negligent placement investigations. Inasmuch as the Legislature has granted caseworkers only a qualified immunity in an emergency situation, it would be inappropriate for us to extend to politically unaccountable caseworkers an immunity traditionally granted judges.

Not only does the Legislature's policy decision preclude the extension of absolute immunity, binding state precedent also requires us to deny the absolute immunity claimed. Our decision in *Bender v. Seattle,* 99 Wn.2d 582, 664 P.2d 492 (1983) controls this case. In *Bender,* we held that an officer who obtains an arrest warrant from a magistrate is nevertheless liable for false arrest. *Bender,* 99 Wn.2d at 592; *accord, Malley v. Briggs,* 475 U.S. 335, 89 L. Ed. 2d 271, 106 S. Ct. 1092 (1986). The magistrate's warrant does not absolve the officer. The court explained that the officer "is not merely directed to fulfill the order of the court; he is in a position to control the flow of information

---

[9]Child Protective Services is part of DSHS, the defendant in this case. *See* RCW 26.44.020(5), (13).

to the magistrate upon which probable cause determinations are made." *Bender,* 99 Wn.2d at 592. Similarly, a caseworker cannot escape liability for negligent investigation because the juvenile court commissioner relies on the caseworker's recommendation to allow a caseworker's placement decision to stand. In the absence of a preplacement adversary hearing in which a predisposition study is entered into evidence, the caseworker controls the flow of information to the court.

DSHS cites no case where this court has extended prosecutorial or judicial immunity to anyone but prosecutors and judges. Judges and prosecutors in this state are usually elected and highly visible officials.

State precedent and legislative policy compel us to reject the caseworkers' claim to absolute immunity. The precedent of intermediate and lower federal courts under 42 U.S.C. § 1983 supports the same result. The one federal court facing a caseworker immunity problem where a state statute granted only qualified immunity has respected the state's policy by declining to extend absolute immunity to the caseworker. *See Jane Doe v. County of Suffolk,* 494 F. Supp. 179, 182–83 (E.D.N.Y. 1980).

Because of the extraordinary sweep of absolute immunity, the United States Supreme Court has been reluctant to extend absolute prosecutorial or judicial immunity to anyone but prosecutors and judges. *See Achterhof v. Selvaggio,* 886 F.2d 826, 829 (6th Cir. 1989) (citing *Malley v. Briggs, supra*); *Imbler v. Pachtman,* 424 U.S. 409, 429, 47 L. Ed. 2d 128, 96 S. Ct. 984 (1976) (justifying absolute immunity for prosecutors by stating that "a prosecutor stands perhaps unique . . . in his amenability to professional discipline by an association of his peers.").

Even in cases involving emergency responses to allegations of child abuse, most federal appellate courts have not granted absolute immunity to caseworkers. *Rinderer v. Delaware Cy. Children & Youth Servs.,* 703 F. Supp. 358, 361 (E.D. Pa. 1987). The case for absolute immunity in the instant case is much less compelling than in the federal

cases because the caseworkers in the case at bench were not responding to an emergency and performed no prosecutorial or judicial functions.

## IV

■ *Bender* precludes the conclusion that the caseworkers deserve quasi–judicial immunity. Because they controlled the flow of information, they could not escape liability even if they had acted under court order. Because the court never ordered the actions complained of, the federal precedent under 42 U.S.C. § 1983 does not support the conclusion that quasi–judicial immunity bars this suit either. Had the court ordered the actions complained of, quasi–judicial immunity would attach.

The Ninth Circuit extended quasi–judicial immunity to a caseworker removing a newborn pursuant to court order in *Coverdell v. Department of Social & Health Servs.,* 834 F.2d 758 (9th Cir. 1987).[10] Because the court specifically ordered the caseworker to remove the child, the court granted her absolute immunity. *Coverdell,* 834 F.2d at 765.

But in the case at bench the court did not order the investigation or the placement recommendation forming the basis of the Babcocks' action in negligence. The caseworkers removed all of the children from the Babcock home without receiving any court order requiring disruption of the Louisiana court's placement decision. They moved Babcock's natural daughters to the Michael residence without court order. DSHS procured a court order authorizing the placement of Aryn and Angela Long after they had already placed them with Wallace, but before they actually moved them to the Michael home.

---

[10]By distinguishing *Coverdell* we do not mean to indicate that we agree with its reasoning. We do not think that ex parte orders can establish quasi–judicial immunity for those carrying them out. Ex parte orders do not offer sufficient procedural protections to warrant the establishment of absolute immunity. *See Meyers v. Contra Costa Cy. Dep't of Social Servs.,* 812 F.2d 1154, 1158 (9th Cir.) (arguing persuasively that the protections of the adversarial process justify absolute immunity and that absent these protections they are not justified), *cert. denied,* 484 U.S. 829 (1987).

Not only did the negligence occur prior to the issuance of a court order, the orders confirming the Michael placement would not have prevented DSHS from remedying the placement had they discovered that Michael was a rapist. The caseworkers have taken the position in this litigation that they need no judicial order to change foster care placement. Brief of Respondent, at 29. Accordingly, they removed the children from their grandparents and made several temporary placements in apparent violation of an outstanding court order from Louisiana placing the children with their grandparents.

If they had discovered that Michael was a rapist, they would surely have removed the children from his care, just as they removed the children from their grandparents' care in spite of an outstanding judicial order. The gravamen of the complaint is not the procurement of a court order. The plaintiffs claim that DSHS did not adequately investigate the Michaels. *Cf. Coverdell* (challenging removal of a child based on allegations of child abuse). This action occurred outside of the judicial process.

## V

Because these caseworkers performed investigative, rather than quasi–prosecutorial functions, they cannot claim prosecutorial immunity.

▮ The Supreme Court has granted prosecutors absolute immunity for "initiating a prosecution and in presenting the State's case". *Imbler v. Pachtman,* 424 U.S. at 431. It purposefully left standing appellate case law holding that absolute immunity did not apply to a prosecutor's investigative function. *Imbler,* at 430.

The gravamen of this complaint is negligent investigation. Even prosecutors cannot claim unqualified immunity for performing investigatory functions under 42 U.S.C. § 1983. *See Mancini v. Lester,* 630 F.2d 990, 992–94 (3d Cir. 1980) (remanding case to determine whether prosecutor's acts were investigatory or advocatory); *Marrero v. Hialeah,* 625 F.2d 499, 506–10 (5th Cir. 1980) (overturning grant of

absolute immunity to prosecutor), *cert. denied sub nom. Rashkind v. Marrero,* 450 U.S. 913 (1981); *Lee v. Willins,* 617 F.2d 320 (2d Cir.) (prosecutor denied absolute immunity for obtaining perjured testimony through threats), *cert. denied,* 449 U.S. 861 (1980); *Jacobson v. Rose,* 592 F.2d 515, 524 (9th Cir. 1978) (no absolute immunity for wiretap), *cert. denied,* 442 U.S. 930 (1979).

The federal courts have accordingly denied immunity to prosecutors' and caseworkers' investigations of child abuse. The Second Circuit in *Robison v. Via,* 821 F.2d 913 (2d Cir. 1987) held that a prosecutor was not immune for taking a child out of her parents' custody to investigate direct complaints of child abuse. *Robison,* at 919. Although the prosecutor obtained a judicial temporary detention order within hours, the court held that prosecutorial immunity did not shield the prosecutor. *Robison,* at 917, 920.

Similarly, the Oregon Supreme Court recently ruled that child custody workers did not enjoy prosecutorial immunity under § 1983 for their investigation of child abuse. *Tennyson v. Children's Servs. Div.,* 308 Or. 80, 775 P.2d 1365 (1989). The defendants in that case removed the child in response to reports of a bruised child. *Tennyson,* at 83–84. The next day a juvenile court heard the caseworker's complaint and placed the child in foster care.

The caseworker returned the child to the parents after a month. Later, a sheriff's detective took the child into custody again. The juvenile court, after a hearing, again placed the girl in foster care upon the caseworker's recommendation. The complaint alleged that the court decision was based "'on the complaint allegations filed by [the caseworker] and the failure of [the caseworker and detective] to present an . . . informed report based on full . . . investigation", allegations remarkably similar to some of those made in this case. *Tennyson,* at 84.

The court based its decision not to grant the caseworkers absolute immunity in part on the fact that the workers need not have involved the court in the removal decision. *Tennyson,* at 89. In the case at bench, defendants have

similarly argued that they did not need a court order to change the children's foster care placement. Brief of Respondent, at 29.

The Fifth Circuit has also declined to extend absolute immunity to caseworkers' investigations of child abuse. *See Hodorowski v. Ray,* 844 F.2d 1210, 1212–16 (5th Cir. 1988); *Austin v. Borel,* 830 F.2d 1356 (5th Cir. 1987). In *Hodorowski,* the caseworkers removed children from their parents' custody and sought a court order within days. 844 F.2d at 1212. In *Austin,* the court responded to a caseworker's accusation of child abuse by entering an order giving the State custody and holding a hearing a few days later. 830 F.2d at 1358.

The most recent cases have followed *Austin* and *Hodorowski* and have distinguished Ninth Circuit precedent extending absolute immunity to caseworkers in some situations. The Tenth Circuit recently refused to extend quasi–prosecutorial immunity to caseworkers who removed children from their foster parents without following statutory procedures, one of the actions complained of in the case at bench, even though a judge held a hearing and issued an order in the matter. *Spielman v. Hildebrand,* 873 F.2d 1377 (10th Cir. 1989). The Sixth Circuit Court of Appeals declined to extend prosecutorial immunity to a caseworker's investigation of child abuse in *Achterhof v. Selvaggio,* 886 F.2d 826 (6th Cir. 1989).

Because the federal appellate courts agree that a caseworker's investigation of a child abuse complaint is not a quasi–prosecutorial act, we cannot extend the prosecutor's immunity to the caseworker's investigation of a foster care placement. Had the caseworkers initiated a petition to establish a Washington dependency and then had the results of the investigation entered into evidence and made a part of an adversary process focusing on disposition, the caseworkers would have a stronger case for absolute immunity.

Because caseworker Tyler never appeared in court or submitted a study admitted into evidence, she cannot

escape liability as a prosecutor "intimately associated with the judicial phase" of the process. *Cf. Imbler,* 424 U.S. at 430.

Caseworker Bronson's court appearance does not establish his role as quasi–prosecutorial, either. Caseworker Bronson's appearance occurred after the caseworkers had placed both children at the Michaels' home and the State's attorney had obtained judicial orders confirming the placement.

The Fifth Circuit's decision in *Austin* also establishes that prosecutorial immunity does not apply to caseworkers' appearances in court even in pursuance of court orders. Caseworkers not initiating proceedings by petition have not enjoyed quasi–prosecutorial immunity. *See Austin v. Borel,* 830 F.2d 1356, 1360–61 (5th Cir. 1987).

Those federal courts that have granted immunity to caseworkers responding to child abuse complaints have carefully limited immunity to functions "*intimately* associated with the judicial phase of the criminal process". (Italics ours.) *Imbler,* 424 U.S. at 430. In particular, several federal appellate cases have extended quasi–prosecutorial immunity to caseworkers initiating proceedings which deprive parents of custody because of allegations of child abuse. *See Meyers v. Contra Costa Cy. Dep't of Social Servs.,* 812 F.2d 1154, 1156 (9th Cir. 1987) (caseworkers granted immunity for attempt to deprive allegedly abusive parent of custody by filing a petition seeking creation of a dependency, but not for prior actions); *Coverdell v. Department of Social & Health Servs.,* 834 F.2d 758, 760 (9th Cir. 1987) (caseworkers obtained and executed court order directing them to take a newborn infant from its mother who had lost custody of another child because of abuse allegations); *Kurzawa v. Mueller,* 732 F.2d 1456, 1457 (6th Cir. 1984) (court order terminated parental rights); *Vosburg v. Department of Social Servs.,* 884 F.2d 133, 134, 138 (4th Cir. 1989) (extending immunity to caseworkers seeking a temporary removal order, but recognizing that

extending immunity to caseworkers' investigations would violate *Imbler* and other federal precedent).[11]

Because Mr. Bronson did not file a petition initiating either civil or criminal proceedings, he acted like a complaining witness not immune at common law, not like a prosecutor. Had he initiated proceedings, he might have some claim to prosecutorial immunity under the case law upon which the dissent relies. His appearance as a witness at a hearing in which the State's counsel, Mr. Miller, acted as the prosecuting attorney, cannot justify bestowing *prosecutorial immunity* upon Bronson.

The *Meyers* case illustrates how careful federal appellate courts have been to limit absolute immunity to duties related to a caseworker filing a petition seeking removal of children in response to allegations of child abuse. *Meyers,* 812 F.2d at 1155. The Ninth Circuit panel in *Meyers* refused to extend immunity to the same caseworker who had filed the petition for actions not prosecutorial in nature. *Meyers,* at 1157.

---

[11]The federal district court cases that have extended absolute immunity to caseworkers likewise deal with emergency responses to allegations of child abuse and often with the attempt to limit parental rights. *See Mazor v. Shelton,* 637 F. Supp. 330 (N.D. Cal. 1986); *Hennessey v. Washington,* 627 F. Supp. 137 (E.D. Wash. 1985); *Pepper v. Alexander,* 599 F. Supp. 523 (D.N.M. 1984) (immunity bars action for malicious prosecution); *Whelehan v. County of Monroe,* 558 F. Supp. 1093, 1093–98 (W.D.N.Y. 1983).

Moreover, significant contrary authority exists on the district court level. *See, e.g., John Doe v. Connecticut Dep't of Children & Youth Servs.,* 712 F. Supp. 277 (D. Conn. 1989) (no absolute immunity protects caseworkers' emergency removal, application for temporary custody, and foster care placement); *Rinderer v. Delaware Cy. Children & Youth Servs.,* 703 F. Supp. 358, 361 (E.D. Pa. 1987) (social workers, unlike prosecutors, do not enjoy absolute immunity); *Czikalla v. Malloy,* 649 F. Supp. 1212 (D. Colo. 1986) (denying absolute immunity to caseworker removing child in response to alleged child abuse); *Pinkney v. Clay Cy.,* 635 F. Supp. 1079, 1082–83 (D. Minn. 1986) (prosecutor absolutely immune, but not caseworker); *Jane Doe v. County of Suffolk,* 494 F. Supp. 179 (E.D.N.Y. 1980) (caseworker filing a petition in child abuse case not entitled to absolute immunity); *Cameron v. Montgomery Cy. Child Welfare Serv.,* 471 F. Supp. 761, 765–66 (E.D. Pa. 1979) (failure to provide adequate services to foster child pursuant to court ordered custody not shielded by quasi–judicial immunity).

In particular, the court held that immunity did not bar a suit arising out of the caseworker's order that Meyers stay away from his home. "Haaland acted unilaterally prior to the operation of the judicial process." *Meyers,* at 1157. This result directly supports the conclusion that the caseworkers in the case at bench cannot claim immunity for their unilateral placement decisions with respect to the Babcock girls nor for their pre–judicial investigation.

The court carefully articulated the reasons for limiting immunity to the filing of a petition seeking to deprive parents of custody of their children through adjudication. In spite of the benefits of immunity for certain decision makers, "the balance might not be struck in favor of absolute immunity were it not for the presence of safeguards built into the judicial process that tend to reduce the need for private damage actions". *Meyers,* at 1158. The court then described a list of safeguards present in the judicial process which make private damage actions unnecessary. These include the independence of the judge, the importance of precedent, the adversary nature of the process, and the ability to correct errors on appeal. *Meyers,* at 1158 (citing *Butz v. Economou,* 438 U.S. 478, 512, 57 L. Ed. 2d 895, 98 S. Ct. 2894 (1978)).

Had DSHS used the statutory procedure provided for placement decisions, the judicial process would have provided these kinds of protections. DSHS, however, obtained a court order prior to placement with the Michaels only with respect to Angela Long and Aryn Long. Michael had already abused Aryn at that time. DSHS procured the court order without an adversary process evaluating the placement recommendation. Precisely because placement was not at issue, the caseworkers prepared no predisposition study nor sent one to the parties. For that reason, the court accepted the caseworkers' recommendation without reading or admitting into evidence the home study which was prepared, and without argument by the parties. Moreover, because these proceedings were dependency review proceedings, the court orders at issue were not appealable

as of right. *In re Chubb,* 112 Wn.2d 719, 773 P.2d 851 (1989).

The Ninth Circuit decision in *Babcock v. Tyler,* 884 F.2d 497 (9th Cir. 1989), *cert. denied,* 110 S. Ct. 1118 (1990), which granted these caseworkers absolute immunity from suit for their civil rights claims, is not determinative because it is based on the incorrect factual statements in *Babcock* I. A proper understanding of the facts compels the conclusion that absolute immunity does not shield these caseworkers given the limitations on absolute immunity described in *Meyers.*

It is good policy to grant caseworkers a qualified immunity for initiation of dependency proceedings without granting absolute immunity for everything they do while a dependency review process continues. *See Meyers,* at 1157 (not characterizing pre–judicial action as in pursuit of court order and declining to extend immunity); *cf. Babcock,* 884 F.2d at 503. This distinction roughly parallels the state legislation which limits caseworker immunity to responses to child abuse in an emergency. As this case illustrates, a dependency review proceeding cannot protect against erroneous placement investigations because it does not focus adversarial attention on a placement study or provide an order appealable as of right. Finally, a caseworker's role in dependency review proceedings resembles that of a complaining witness not immune at common law. The caseworker does not initiate court proceedings addressing the criminal act of child abuse.

In any case, the caseworkers' fear of financially devastating litigation would not "deprive the court of information it needs", as the Ninth Circuit panel stated. *Babcock,* 884 F.2d at 503. Rather, it would encourage thorough investigation.

Removing caseworker fear of liability is appropriate in an emergency. In other situations, the law ought to encourage careful investigation and the use of adversarial judicial

processes. Because the wrongs to which the Babcocks complain occurred almost entirely outside of the judicial process, neither prosecutorial immunity nor judicial immunity protects the caseworkers' actions.

## VI

Although both parties have focused primarily upon the absolute immunity issue, the trial court actually ruled that the caseworkers were entitled to qualified immunity. Clerk's Papers, at 103–04. The trial court stated that the caseworkers were entitled to qualified immunity because the record showed no evidence of malicious intent or deliberate indifference.[12] This is not the standard governing qualified immunity in Washington.

Although the federal courts have only granted caseworkers absolute immunity under very limited circumstances, they have often granted them qualified immunity when they followed statutory procedures. *See, e.g., Spielman v. Hildebrand,* 873 F.2d 1377, 1389 (10th Cir. 1989); *Hodorowski v. Ray,* 844 F.2d 1210, 1217 (5th Cir. 1988). We have extended a similar immunity to police officers charged with false arrest. *See Guffey v. State,* 103 Wn.2d 144, 690 P.2d 1163 (1984). Like police officers, caseworkers must make decisions which greatly interfere with people's lives. Like police officers, the need for some legal restraints on their power precludes absolute immunity, but the need to make

---

[12]The trial court confused the issue of qualified immunity with the issue of what degree of culpability suffices to create liability under 42 U.S.C. § 1983. *See Doe v. New York City Dep't of Social Servs.,* 649 F.2d 134, 141 (2d Cir. 1981) (culpability under 42 U.S.C. § 1983 requires deliberate indifference). It also read *Spurrell v. Bloch,* 40 Wn. App. 854, 865, 701 P.2d 529, *review denied,* 104 Wn.2d 1014 (1985) as stating that, absent a positive showing of malice, qualified immunity applies under 42 U.S.C. § 1983. We have held that under 42 U.S.C. § 1983 the absence of a reasonable good faith belief that actionable conduct was constitutional can justify a denial of qualified immunity. *Hocker v. Woody,* 95 Wn.2d 822, 825, 631 P.2d 372 (1981). We have never required an affirmative showing of malice as a prerequisite to suit under 42 U.S.C. § 1983. Moreover, the scope of immunities under 42 U.S.C. § 1983 does not determine the scope of immunities from state tort claims.

difficult judgments under extremely difficult circumstances justifies qualified immunity. *See Guffey*, at 151.

■ We therefore hold that caseworkers are entitled to the qualified immunity defined in *Guffey* for foster care placement decisions. In order to qualify for the immunity, the caseworker must (1) carry out a statutory duty, (2) according to procedures dictated by statute and superiors, and (3) act reasonably. *Guffey*, at 152.

We reverse the trial court's holding on qualified immunity because the trial court did not apply the *Guffey* standard to these caseworkers. It granted them immunity on the grounds that they did not act maliciously. Lack of malice is necessary but not sufficient to establish qualified immunity under *Guffey*.

Caseworkers cannot claim even a qualified immunity when they fail to follow statutory procedures. On remand, the caseworkers can only win immunity by establishing that the entire chain of events leading up to the placement at the Michael home was in accordance with statutory and regulatory procedures in every respect, that their actions were reasonable, and that their statutory duties required their actions. *See L.J. v. Massinga*, 838 F.2d 118 (4th Cir. 1988) (failure to develop a case plan in accordance with federal requirements defeats qualified immunity claim), *cert. denied*, 488 U.S. 1018 (1989); *Del A. v. Edwards*, 855 F.2d 1148 (5th Cir.) (same), *reh'g granted*, 862 F.2d 1107 (5th Cir. 1988), *appeal dismissed*, 867 F.2d 842 (5th Cir. 1989). Asserting that an attorney approved some of their actions does not suffice. If caseworkers remove children from their homes without following the proper procedures, they cannot expect immunity for a disastrous placement.

Because the trial court did not apply the correct qualified immunity standard, we leave the caseworkers' right to qualified immunity open on remand. But we must note that Babcock has alleged that the caseworkers did not fulfill important legal obligations. Clerk's Papers, at 3736. DSHS

admitted never having developed a case plan for the children in this case. Clerk's Papers, at 3744, 3415. The caseworkers admitted transferring the children without giving Rudolph Babcock prior notice or a prior hearing. Clerk's Papers, at 3733–35, 3396–97, 3403, 3405, 3408, 3435. The caseworkers admitted not giving Rudolph Babcock notice or a hearing prior to assuming jurisdiction over the case. Clerk's Papers, at 3734, 3402–03. The caseworkers have also admitted that they did not follow the statutory placement procedure. Clerk's Papers, at 3401, 3402, 3414. If the trial court concludes that DSHS had any legal obligation to develop a case plan, provide prior notice or a hearing to Rudolph Babcock or his parents before moving his children, or follow the predisposition procedure, it must deny any motion for qualified immunity on summary judgment. We mention this by way of illustrating the implications of our holding for the guidance of the trial court, not to indicate that all issues relevant to qualified immunity are amenable to summary judgment or to limit the Babcocks' arguments on remand in the event the caseworkers wish to argue that they are entitled to qualified immunity.

The immunity we create today is a personal immunity designed to limit an individual caseworker's liability for damages. As reported sexual abuse grows more common, the pressures and difficulties these caseworkers face grow as well. The common law must respond to these changing conditions. It cannot respond to this by immunizing them for actions taken without statutory authority, however. Officials with the power to remove children from their parents cannot be wholly free from legal restraint.

## VII

■■ Because the State is a party, we must determine whether the immunity we have created for caseworkers can apply to the State. Legislative policy requires us to hold that DSHS cannot claim the qualified immunity of its caseworkers as does the majority of precedent on the subject. The Legislature has granted caseworkers a qualified

immunity for taking children into 72–hour protective custody, see RCW 26.44.056(3). By creating a qualified immunity not contemplated by the Legislature, we may immunize some caseworkers for nonemergency conduct. The Legislature never contemplated such an immunity.

Accordingly, in granting caseworkers a qualified immunity for taking children into 72–hour protective custody, the Legislature made it clear that it did not intend to supersede or abridge the remedies provided in RCW 4.92. See RCW 26.44.060(3). RCW 4.92 provides for actions against the State and repeals sovereign immunity. The common law immunity we have granted caseworkers today is reasonably consistent with the legislative policy. We cannot, however, extend that immunity to state agencies in the face of a statutory provision admonishing us not to construe an emergency immunity to abrogate sovereign immunity. Sound policy considerations justify granting caseworkers some immunity. We must, however, do so in a manner which does not deprive those wronged by DSHS's actions of a remedy which the Legislature contemplated they would have.

An agent's immunity from civil liability generally does not establish a defense for the principal. Restatement (Second) of Agency § 217 (1958). Accordingly, the immunities of governmental officials do not shield the governments which employ them from tort liability, even when liability is predicated upon respondeat superior. *James v. Prince George's Cy.*, 288 Md. 315, 418 A.2d 1173, 1182–84 (1980) (County may be held liable even if volunteer firemen were immune); *Bridges v. Alaska Housing Auth.*, 375 P.2d 696, 702–03 (Alaska 1962) (housing authority liable even if employees are immune); *Muntan v. Monongahela*, 45 Pa. Commw. 23, 406 A.2d 811, 813–14 (1979) (City may be liable although police officers have personal immunity). Similarly, the qualified immunity granted government officials under 42 U.S.C. § 1983 is a personal defense which shields the official from suit in his or her personal capacity but not in his or her official capacity. Suits against individuals in

their official capacity are treated like suits against entities and personal defenses do not apply to suits against entities. *Kentucky v. Graham*, 473 U.S. 159, 87 L. Ed. 2d 114, 105 S. Ct. 3099 (1985) (governmental officials sued in their official capacity cannot claim qualified immunity); *Louisiana Land & Exploration Co. v. Amoco Prod. Co.*, 878 F.2d 852, 855 (5th Cir. 1989) (governmental immunity is a personal defense because it applies to all members of a class as a matter of public policy); *Duckworth v. Franzen*, 780 F.2d 645, 649 (7th Cir. 1985) (good faith immunity is a personal defense available to state officers sued in a personal capacity), *cert. denied*, 479 U.S. 816 (1986). The United States Supreme Court has held that municipalities are not shielded by the immunities of their agents. *Owen v. Independence*, 445 U.S. 622, 63 L. Ed. 2d 673, 100 S. Ct. 1398 (1980).

In the past, we have extended the personal immunities of some officials to the government. *See Creelman v. Svenning*, 67 Wn.2d 882, 410 P.2d 606 (1966) (the County and State are immune from liability for malicious prosecution); *Guffey*, at 153 (State and Washington State Patrol cannot be held liable when the trooper is immune). But in both *Creelman* and *Guffey* the State had committed no acts of its own; the plaintiffs could only sue on the basis of respondeat superior. In the case at bench, however, the Babcocks have alleged that DSHS's negligent supervision caused injury. Personal immunities granted employees cannot reach the separate actions of their employer because a judgment in favor of one tortfeasor does not terminate claims against a separate tortfeasor. *See* Restatement (Second) of Judgments § 49 (1982).

More importantly, we have acknowledged that policy considerations control the question of whether a government agency can take advantage of its agent's immunity defense. *Creelman*, at 885.

Our holding means that caseworkers may have to appear as witnesses at DSHS trials from time to time. But our

holding protects them from financially debilitating damage awards based on immune conduct.

The existence of some tort liability will encourage DSHS to avoid negligent conduct and leave open the possibility that those injured by DSHS's negligence can recover. It will also encourage caseworkers to attend carefully to their legal obligations without allowing the threat of personal liability to foster undue timidity in the performance of their duties. We note that our Legislature's view that the immunity of the individual caseworkers should be broader than that of the government is in accord with the views of commentators on governmental tort liability. *See* Bermann, *Integrating Governmental and Officer Tort Liability,* 77 Colum. L. Rev. 1175, 1186–87 (1977). *See generally* P. Schuck, Suing Government (1983). We, of course, intimate no view as to whether DSHS has negligently caused the injuries suffered by the children in this case; that issue has not been addressed at trial.

## CONCLUSION

We affirm the trial court's dismissal of the claims for alienation of affections and outrage but reverse the dismissal of the Babcocks' negligence claims. We hold that the State has no immunity from suit and that absolute immunity does not apply in this case. We remand for further proceedings consistent with this opinion.

BRACHTENBACH and SMITH, JJ., and CALLOW and WIE-LAND, JJ. Pro Tem., concur.

ANDERSEN, J. (concurring in part, dissenting in part)— The majority opinion has accorded a very narrow, if not totally illusory, immunity to Department of Social and Health Services (DSHS) caseworkers. It also abolishes witness immunity for such caseworkers (or declines to apply it) and refuses to define for future cases any possibility of quasi–prosecutorial immunity for them.

The relevant immunities necessary to be considered here are the following: (1) quasi–prosecutorial immunity and quasi–judicial immunity; (2) witness immunity; and (3) statutory immunities. The questions this case raises are whether any of these apply to DSHS caseworkers' testimony, investigations or placement recommendations and, if not, whether any other immunity should be afforded to protect caseworkers performing these functions for the State. A further question involves the extent of any immunity afforded to the Department of Social and Health Services (DSHS) itself.

Immunity is not accorded because of the *status* of an individual but because of the *function* being performed by that individual.[13] A caseworker should not be afforded immunity based upon the status of that job, but rather should be accorded the immunity which applies to the particular function being performed. Therefore, if a caseworker is acting as a witness or performing the equivalent function of a witness, then witness immunity (which is absolute) is appropriate; if acting like a prosecutor, then quasi–prosecutorial immunity (which is also absolute) should be accorded; if acting pursuant to court order, then absolute quasi–judicial immunity is necessary; if performing acts described by a statute that provides immunity, then the statutory immunity certainly applies. Neither the majority, nor the dissent, has analyzed the various immunities available and applied them to the challenged actions of these caseworkers, or remanded to the trial court with those guidelines. Because of this, the majority opinion gives very little guidance for future cases. I will, therefore, proceed to describe these immunities in this separate opinion.

---

[13]*Imbler v. Pachtman,* 424 U.S. 409, 430–31, 47 L. Ed. 2d 128, 96 S. Ct. 984 (1976); *Butz v. Economou,* 438 U.S. 478, 508–13, 57 L. Ed. 2d 895, 98 S. Ct. 2894 (1978); *Alicia T. v. County of Los Angeles,* __ Cal. App. 3d __, 271 Cal. Rptr. 513, 517 (1990); *Spielman v. Hildebrand,* 873 F.2d 1377, 1381 (10th Cir. 1989); *Briscoe v. LaHue,* 460 U.S. 325, 342, 75 L. Ed. 2d 96, 103 S. Ct. 1108 (1983).

# I
## PROSECUTORIAL IMMUNITY

In this state, prosecutors are accorded absolute immunity when acting in their official capacity even if accused of acting maliciously or corruptly.[14]

To the extent caseworkers' actions are prosecutorial in nature, those actions should be accorded quasi–prosecutorial (absolute) immunity.[15] The critical issue then becomes what actions of a child protective services caseworker are prosecutorial in nature. A number of cases have held that caseworkers are functioning in a prosecutorial manner when initiating or pursuing child dependency proceedings.[16] This immunity is granted because those responsible for the initiation and pursuance of dependency proceedings, like prosecutors, must be able to perform their necessary tasks of protecting the health and well being of children without fear of intimidation and harassment.[17] This immunity should continue during the conduct of the ongoing court

---

[14]*Loveridge v. Schillberg*, 17 Wn. App. 96, 99, 561 P.2d 1107 (1977); *Filan v. Martin*, 38 Wn. App. 91, 96, 684 P.2d 769 (1984); *Coffel v. Clallam Cy.*, 47 Wn. App. 397, 402, 735 P.2d 686 (1987); *Mitchelle v. Steele*, 39 Wn.2d 473, 474, 236 P.2d 349 (1951); *Frost v. Walla Walla*, 106 Wn.2d 669, 673, 724 P.2d 1017 (1986); *Creelman v. Svenning*, 67 Wn.2d 882, 884, 410 P.2d 606 (1966); *Kuchenreuther v. Whatcom Cy.*, 24 Wn. App. 716, 718, 604 P.2d 499 (1979); *Collins v. King Cy.*, 49 Wn. App. 264, 271, 742 P.2d 185 (1987); *Ashelman v. Pope*, 793 F.2d 1072, 1076 (9th Cir. 1986); *Imbler*, 424 U.S. at 425–27. *See also* W. Keeton, D. Dobbs, R. Keeton & D. Owen, *Prosser and Keeton on Torts* § 132, at 1057–58 (5th ed. 1984).

[15]*Babcock v. Tyler*, 884 F.2d 497, 502 (9th Cir. 1989), *cert. denied*, ___ U.S. ___, 107 L. Ed. 2d 1025, 110 S. Ct. 1118 (1990); *Coverdell v. Department of Social & Health Servs.*, 834 F.2d 758, 763–64 (9th Cir. 1987); *Meyers v. Contra Costa Cy. Dep't of Social Servs.*, 812 F.2d 1154, 1157 (9th Cir.), *cert. denied*, 484 U.S. 829, 98 L. Ed. 2d 59, 108 S. Ct. 98 (1987); *Mazor v. Shelton*, 637 F. Supp. 330, 335 (N.D. Cal. 1986); *Fogle v. Benton Cy. SCAN*, 665 F. Supp. 729, 733–34 (W.D. Ark. 1987); *Whelehan v. County of Monroe*, 558 F. Supp. 1093, 1098 (W.D.N.Y. 1983).

[16]*See, e.g., Coverdell*, 834 F.2d at 763–64 and cases cited therein; *Meyers*, 812 F.2d at 1157; *Kurzawa v. Mueller*, 732 F.2d 1456, 1458 (6th Cir. 1984); *Babcock v. Tyler*, 884 F.2d 497, 502 (9th Cir. 1989), *cert. denied*, ___ U.S. ___, 107 L. Ed. 2d 1025, 110 S. Ct. 1118 (1990); *Alicia T.*, 271 Cal. Rptr. at 518.

[17]*Kurzawa*, 732 F.2d at 1458.

proceedings for the same public policy reasons that necessitate the original immunity.[18]

The majority appears to concede that had the caseworkers initiated a petition to establish a Washington dependency, then they would have had some claim to prosecutorial immunity. Majority opinion, at 612, 614. Under our statutes, such a dependency must be reviewed by a court every 6 months to determine whether court supervision should continue. Former RCW 13.34.130(3). I fail to see why a caseworker's immunity for *initiation* of dependencies should not continue throughout the statutorily mandated review of these dependencies, otherwise, at what point during this process would the caseworkers' immunity evaporate?

Conduct in direct preparation for, participation in, and reports prepared for dependency and dependency review proceedings should all fall within this category. The caseworkers in the case before us did not initiate the first dependency proceedings (which occurred in Louisiana), but the Washington courts were monitoring that dependency and held *11 hearings* in Benton County from November 5, 1981 through October 31, 1983. At those hearings an attorney for Rudolph Babcock, an attorney for the four girls, and an attorney for the State all argued regarding the continued dependency *and* the proper placement of these children. I would hold that the caseworkers' involvement in those contested court proceedings is immune under a prosecutorial type of immunity.

To support its refusal to recognize the possible application of quasi–prosecutorial immunity to caseworkers when they are performing a role similar to that of a prosecutor, the majority misleads as to the status of Washington law when it declares:

> DSHS cites no case where this court has extended prosecutorial or judicial immunity to anyone but prosecutors and

---

[18]*Alicia T.,* 271 Cal. Rptr. at 519; *Babcock,* 884 F.2d at 503; *Meyers,* 812 F.2d at 1157.

judges. Judges and prosecutors in this state are usually elected and highly visible officials.

Majority opinion, at 608.

While DSHS may not have cited these cases, they most assuredly do exist! The fact is that Washington cases have repeatedly extended prosecutorial and judicial immunity to others who are not elected or highly visible individuals. In *Tobis v. State,* 52 Wn. App. 150, 154, 758 P.2d 534 (1988), the court correctly observed that "[t]he doctrine of judicial immunity has been extended to individuals associated with the judicial function." Some obvious examples of this are the following: *Adkins v. Clark Cy.,* 105 Wn.2d 675, 678–79, 717 P.2d 275 (1986) (extending judicial immunity to bailiffs); *Bader v. State,* 43 Wn. App. 223, 226, 716 P.2d 925 (1986) (extending absolute judicial immunity to Eastern State Hospital because its psychiatrists and mental health providers were rendering advisory opinions to the court); *Tobis,* 52 Wn. App. at 158 (extending judicial immunity to the State and to mental health professionals directed by statute to assist the court); *Collins v. King Cy.,* 49 Wn. App. 264, 271, 742 P.2d 185 (1987) (recognizing that the absolute immunity enjoyed by prosecuting attorneys also applies to the governmental entity for which they work and to the workers whom they employ); and *Pleas v. Seattle,* 112 Wn.2d 794, 809–10, 774 P.2d 1158 (1989) (extending judicial immunity for a city council's rezoning decision).

The majority recognizes that caseworkers who act according to a court order share in the judicial immunity of the judge who executed the order. Majority opinion, at 609. This is correct.[19] However, the majority misconstrues the facts when it compares the present case with *Bender v. Seattle,* 99 Wn.2d 582, 664 P.2d 492 (1983). In *Bender,* this court held that an arrest warrant issued by a magistrate does not immunize a police officer who executes the warrant from liability for false arrest *if* the same officer had

---

[19]*Coverdell,* 834 F.2d at 764–65. *See also K.H. v. Morgan,* 914 F.2d 846, 854 (7th Cir. 1990).

provided all the information used as the basis for issuing the warrant. As pointed out above, almost a dozen contested hearings took place in the present case and many of the caseworker's actions were performed in furtherance of court orders. As the State correctly points out, the plaintiffs' argument that the entry of court orders here was analogous to the ex parte issuance of an arrest warrant based upon a deficient affidavit is *not* supported by the facts of this case. The proceedings involving continued dependency and temporary placement of the girls in this case were *adversarial,* the parties were *represented,* placement with the Michaels was *contested* and it was *the court* that ultimately made the decisions! To the extent the caseworkers acted under court order, I would afford their actions quasi–judicial immunity.

The majority indicates that because these were dependency review hearings and not dispositional hearings that the caseworkers' placement of the children cannot be protected by court order. However, this ignores the fact that children removed from their homes, even temporarily, must be placed somewhere! The majority opinion admits that the trial judge has authority to change a placement during a dependency review hearing. Majority opinion, at 602 n.5. If the court has that authority and does indeed order the placement of a child, then the caseworkers must be allowed to follow that judicial order and in doing so share in the judicial immunity.

The federal Ninth Circuit Court of Appeals recently discussed the question of immunity for caseworkers executing court orders in *Coverdell v. Department of Social & Health Servs.,* 834 F.2d 758 (9th Cir. 1987). That court held that child protective service workers must be accorded absolute quasi–judicial immunity from liability for damages stemming from the worker's actions taken pursuant to valid court orders. The court explained:

> The rationale for immunizing persons who execute court orders is apparent. Such persons are themselves "integral parts of the judicial process." *Briscoe v. LaHue,* 460 U.S. 325, 335,

103 S.Ct. 1108, 1116, 75 L.Ed.2d 96 (1983). The fearless and unhesitating execution of court orders is essential if the court's authority and ability to function are to remain uncompromised. As the First Circuit has explained with respect to a receiver who acted pursuant to court directives:

> To deny him this [absolute] immunity would seriously encroach on the judicial immunity already recognized by the Supreme Court. . . . It would make the receiver a lightning rod for harassing litigation aimed at judicial orders. In addition to the unfairness of sparing the judge who gives an order while punishing the receiver who obeys it, a fear of bringing down litigation on the receiver might color a court's judgment in some cases. . . .
> *Kermit Constr. Corp. [v. Banco Credito y Ahorro Ponceno],* 547 F.2d [1,] at 3 [(1st Cir. 1976)].

*Coverdell,* 834 F.2d at 765.

To my view, this logic is irrefutable. I would hold that caseworker actions taken pursuant to court order after adversarial proceedings constitute protected conduct. The exact nature of those judicial hearings is irrelevant if the fact of placement is decided by the judge after an adversarial proceeding.

I would join the courts that have afforded quasi–prosecutorial immunity to caseworkers for their participation in, and direct preparation for, dependency and dependency review proceedings. This immunity would protect reports prepared in anticipation of those proceedings. I would also extend quasi–judicial (absolute) immunity to caseworkers for actions taken pursuant to court order following adversarial proceedings. Some of the caseworkers' challenged conduct in this case falls in these categories.

## II
### WITNESS IMMUNITY

The majority opinion states:

> Because Mr. Bronson did not file a petition initiating either civil or criminal proceedings, he acted like a complaining witness not immune at common law, not like a prosecutor. Had he initiated proceedings, he might have some claim to prosecutorial immunity under the case law upon which the dissent relies. His appearance as a witness at a hearing in which the State's counsel, Mr. Miller, acted as the prosecuting attorney, cannot justify bestowing *prosecutorial immunity* upon Bronson.

Majority opinion, at 614. This statement totally ignores two important facts. First, if the majority is indicating that Mr. Bronson can be liable as a "complaining witness" in a civil action for malicious prosecution, it fails to note that a plaintiff in such a case would have to prove him guilty of *malice* to establish liability.[20] Malice in this context is satisfied only if the prosecution complained of was undertaken from improper or wrongful motives or in reckless disregard of the rights of the plaintiff.[21]

Second, and more importantly, the majority's analysis ignores the immunity this court and other courts customarily afford to *witnesses*.[22] Because prosecutorial immunity might not apply when a person acts as a witness does not mean that witness immunity is inapplicable. The majority opinion's refusal to recognize witness immunity is completely at odds with our recent decision in *Bruce v. Byrne–Stevens & Assocs. Eng'rs, Inc.,* 113 Wn.2d 123, 776 P.2d 666 (1989). As the plurality opinion in *Bruce* points out:

> As a general rule, witnesses in judicial proceedings are absolutely immune from suit based on their testimony.

*Bruce,* 113 Wn.2d at 125. Furthermore,

> Guardians, therapists and attorneys who *submit reports* to family court are absolutely immune.

*Bruce,* 113 Wn.2d at 127 (citing *Myers v. Morris,* 810 F.2d 1437, 1466 (8th Cir.) (damage claims based on the function of testifying before the family court foreclosed by absolute witness immunity for both oral testimony and reports and recommendations to the family court), *cert. denied,* 484 U.S. 828 (1987)). I agree this correctly states the law. In a

---

[20]*Bender v. Seattle,* 99 Wn.2d 582, 593, 664 P.2d 492 (1983); *Austin v. Borel,* 830 F.2d 1356, 1361 (5th Cir. 1987).

[21]*Bender,* 99 Wn.2d at 594; *Peasley v. Puget Sound Tug & Barge Co.,* 13 Wn.2d 485, 502, 125 P.2d 681 (1942).

[22]*Bruce v. Byrne–Stevens & Assocs. Eng'rs, Inc.,* 113 Wn.2d 123, 776 P.2d 666 (1989); *Butz v. Economou,* 438 U.S. 478, 512, 57 L. Ed. 2d 895, 98 S. Ct. 2894 (1978); *Briscoe v. LaHue,* 460 U.S. 325, 330–33, 75 L. Ed. 2d 96, 103 S. Ct. 1108, 1110 (1983).

case such as the one before us, any other rule would largely destroy the ability of family and juvenile courts to function because such courts must necessarily rely heavily on the data and opinions of caseworkers, guardians and mental health providers.

The majority seems to have the notion that because it would normally apply only a qualified immunity to the actions of a caseworker, no absolute immunity can be afforded to the caseworker when acting as witness. The law is otherwise. The fact that an official enjoys a qualified statutory or common law immunity of one type does not foreclose the application of a different type of immunity (which may be absolute) when that person is acting in a particular capacity. For example, although police officers may normally enjoy qualified immunity, they enjoy absolute immunity when acting as a witness.[23]

The majority also seems to be saying that it is the investigation for the reports or for the testimony which provides the basis for civil liability for negligence. However, the act of reporting to a court involves more than committing information to paper; it necessarily involves the gathering of that information. In *Bruce,* the plaintiff argued that even if the witness was immune for his testimony, he could still be civilly liable for his alleged negligence in actions preceding the testimony which formed the basis of the testimony. We rejected that theory noting that "[w]itness immunity must extend to the *basis* of the witness' testimony, or the policies underlying such immunity would be undermined." (Italics mine.)[24] I, therefore, would afford witness immunity to caseworkers for their participation in contested court proceedings, and for reports prepared in anticipation of such proceedings, whether such reports were formally admitted into evidence or not. It makes no sense to afford

---

[23]*Austin v. Borel,* 830 F.2d 1356, 1359 (5th Cir. 1987); *Briscoe,* 460 U.S. at 335, 342–46.

[24]*Bruce,* 113 Wn.2d at 135.

witness immunity to "[g]uardians, therapists and attorneys who submit reports to family court", as we provided in *Bruce*[25] and then deny that immunity, as the majority does, to caseworkers who are performing the same function.

The court in *Kurzawa v. Mueller,* 732 F.2d 1456, 1458 (6th Cir. 1984) considered the findings of a psychologist and a psychiatrist who examined a child. Those findings were used by Michigan's equivalent to our state's DSHS and by the trial court to determine what environment would best serve the interests of the child. The Sixth Circuit determined that such information could not provide a basis for civil liability because the function of providing such information is analogous to that of a witness. The adversarial quality of the court proceedings provides the needed safeguards for such actions. In a court proceeding, while the court takes the evaluation of a mental health professional (or a caseworker) into consideration, it is *the court* which ultimately makes its own decision concerning the issue.[26]

I do agree with the majority that where the caseworker obtains only an ex parte order during which the caseworker controls the entire flow of information to the judge, then absolute immunity is not necessarily appropriate. But that is *not* the situation here. In the present case, caseworker Bronson testified at a lengthy (2–day) and very hotly contested hearing at which *all* of the following were present: the attorney for the State; the attorney for the Babcock girls' father (Rudolf Babcock); the attorney for the four dependent children; a mental health therapist; a clinical therapist; a counselor; Lee Michael (the girls' maternal uncle and now, but not then, a convicted rapist); Janet Michael (the girls' maternal aunt); Rudolf Babcock (natural father of the Babcock girls and stepfather of the Long girls); a classmate of the girls; and Daniel Long (father of

[25]*Bruce,* 113 Wn.2d at 127.

[26]*Tobis v. State,* 52 Wn. App. 150, 159, 758 P.2d 534 (1988).

the Long girls). There was strong disagreement among the various relatives as to the proper placement of the dependent children and it was *the court* which made the decision regarding placement. This is absolutely *not* a *Bender*–type factual scenario with caseworker Bronson controlling all of the information flowing to the court. According to our own case law, then, Mr. Bronson should be accorded witness immunity. I would hold that to the extent social workers are acting as witnesses in a judicial proceeding, they are entitled to witness immunity.[27]

In conclusion with respect to witness immunity, I would hold as follows: (1) the DSHS caseworkers are immune from liability for damages resulting from their testimony to the court; (2) recommendations by DSHS caseworkers (like recommendations by mental health providers) made to a court for purposes of deciding what environment best serves the interests of the child also enjoy absolute witness immunity; and (3) investigation, testing, and evaluation that directly form the basis of the testimony or recommendations of DSHS caseworkers are also immune as an integral part of witness immunity.

I would leave it to the trial court on remand to determine which of the caseworkers' actions fall within these criteria and are thus protected under witness immunity. Mr. Bronson's testimony to the court and his work directly related to that testimony should clearly be afforded witness immunity.

---

[27]*Bruce v. Byrne–Stevens & Assocs. Eng'rs, Inc.,* 113 Wn.2d 123, 776 P.2d 666 (1989); *Babcock v. Tyler,* 884 F.2d 497, 501 (9th Cir. 1989) (citing *Butz v. Economou,* 438 U.S. 478, 512, 57 L. Ed. 2d 895, 98 S. Ct. 2894, 2913 (1978)), *cert. denied,* 110 S. Ct. 1118 (1990); *Meyers v. Contra Costa Cy. Dep't of Social Servs.,* 812 F.2d 1154, 1156 (9th Cir.) (holding it to be beyond doubt that the testimony a caseworker gave is afforded absolute immunity because witnesses, including government witnesses, are immune from liability for their testimony) (citing *Briscoe v. LaHue,* 460 U.S. 325, 75 L. Ed. 2d 96, 103 S. Ct. 1108 (1983)), *cert. denied,* 484 U.S. 829, 98 L. Ed. 2d 59, 108 S. Ct. 98 (1987).

## III
### STATUTORY IMMUNITY

The Legislature has now accorded broad immunity to a caseworker when responding to abuse or neglect allegations, so long as the caseworker is acting in good faith.[28]

The majority assumes that because the Legislature has extended a broad immunity to caseworkers in emergency removal situations, that it thereby meant to foreclose the possibility of other immunities in less exigent circumstances. The immunity granted in RCW 26.44.056(3) is a portion of a statute dealing with emergency 72–hour removal of endangered children and hence addresses only those situations. I do not read a broader negative legislative intent into this enactment. However, after the majority opinion herein, if the Legislature wishes caseworkers to have immunity any broader than the very narrow immunity accorded by the majority opinion, then it will have to act.

## IV
### QUALIFIED IMMUNITY

While the majority refuses to define or apply any quasi–prosecutorial or quasi–judicial immunity, or any witness immunity, it does purport to accord protection from liability for caseworkers by a grant of what it terms "qualified immunity". I use the word "purport" advisedly, because this so–called grant is so qualified as to be virtually nonexistent and illusory. I fail to see that the majority affords any degree of genuine protection to caseworkers at all. The majority opinion states:

> On remand, the caseworkers can only win immunity by establishing that the *entire chain of events* leading up to the placement at the Michael home was in accordance with statutory and regulatory procedures *in every respect,* that their actions were reasonable, and that their statutory duties *required their actions.*

(Italics mine.) Majority opinion, at 618.

---

[28]RCW 26.44.056(3); RCW 26.44.060(1).

If all of this were so, then the caseworkers have done nothing wrong and no liability would attach in any event and the "immunity" would be superfluous. If an official's duties are performed without error of any kind, then no immunity would ever be necessary.

Essentially, what the majority has done here is to take the qualified immunity afforded to police officers, then substantially reduce the degree of that immunity, while at the same time ignoring case law which holds that a police officer's immunity is not broad enough for caseworkers given their prosecutorial–type functions and judicial reporting duties.[29]

With the exception of witness immunity (which is absolute) and quasi–prosecutorial immunity (which is also absolute), I agree with the majority that caseworkers should not be accorded *absolute* immunity for the other functions they perform. However, I believe we must balance the needs of overburdened caseworkers, who are usually honestly (and often hastily) attempting to protect weak, vulnerable and endangered children in our society, with the need to protect family privacy and to make society's protecting arm (DSHS and its agents) accountable to a reasonable standard of care. While these competing goals are inherently difficult to reconcile, some balance must be struck so as to address both needs. It is because the majority opinion does not strike such a balance that I write this separate opinion.

I would accord a broader qualified immunity to DSHS caseworkers than does the majority. I would hold that to the extent caseworkers' conduct is not encompassed by witness or quasi–prosecutorial or quasi–judicial immunity and therefore absolutely immune (as discussed above), their conduct should be qualifiedly immune from liability *so long as* their actions were taken in substantial compliance with statutes and regulations governing their behavior and were

---

[29]*See, e.g., Coverdell v. Department of Social & Health Servs.,* 834 F.2d 758, 763–64 (9th Cir. 1987).

taken in good faith. This qualified immunity would be similar in its effect to that afforded by a number of federal courts.[30]

The majority grants qualified immunity to caseworkers so long as they carry out a statutory duty, according to procedures dictated by statute and supervisors, and act reasonably. Majority opinion, at 618. What is not clear from the majority opinion is whether this qualified immunity will ever spare caseworkers from the rigors of a trial, that is, whether the question of qualified immunity can ever be resolved on summary judgment.

The majority states that it is extending an immunity which is similar to that granted in *Spielman v. Hildebrand,* 873 F.2d 1377 (10th Cir. 1989) and in *Hodorowski v. Ray,* 844 F.2d 1210 (5th Cir. 1988). Majority opinion, at 617. In *Hodorowski,* at 1217, the court concluded that the caseworkers' actions were not absolutely immune but were qualifiedly immune but nonetheless dismissed the action because their conduct was "*objectively reasonable,* and *as a matter of law* violated no clearly established right." (Italics mine.) In *Spielman,* the court concluded that the trial court properly granted *summary judgment* in favor of the defendant caseworkers *based upon their qualified immunity.* The majority also relies upon *Austin v. Borel,* 830 F.2d 1356 (5th Cir. 1987). Majority opinion, at 612. In *Austin,* the court refused to afford absolute immunity but granted qualified immunity and went on to explain:

---

[30]*See Austin v. Borel,* 830 F.2d 1356, 1363 (5th Cir. 1987) (holding a caseworker's qualified immunity provides protection to all but the plainly incompetent or those who knowingly violate the law); *Hodorowski v. Ray,* 844 F.2d 1210, 1217 (5th Cir. 1988) (holding caseworkers' actions objectively reasonable and not violative of clearly established right and therefore shielded from liability under their qualified immunity); *Meyers v. Contra Costa Cy. Dep't of Social Servs.,* 812 F.2d 1154, 1158 (9th Cir.) (citing *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 73 L. Ed. 2d 396, 102 S. Ct. 2727 (1982) (holding qualified immunity shields from liability where conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known)), *cert. denied,* 484 U.S. 829, 98 L. Ed. 2d 59, 108 S. Ct. 98 (1987).

Our conclusion does not, however, necessarily mean these workers must go through the expense of discovery and trial. "As the qualified immunity defense has evolved, it provides ample protection to all but the plainly incompetent or those who knowingly violate the law." Unless the plaintiff's allegations state a claim of violation of clearly established law, a defendant pleading qualified immunity is entitled to dismissal before the commencement of discovery. Even if the plaintiff's complaint adequately alleges the commission of acts that violated clearly established law, the defendants are entitled to summary judgment if discovery fails to uncover evidence sufficient to create a genuine issue as to whether the defendant in fact committed those acts. In remanding this case to the district court for further proceedings, we express no opinion regarding defendants' right to dismissal on the ground of qualified immunity.

(Footnotes omitted.) *Austin,* 830 F.2d at 1363. The majority also relies extensively on *Meyers v. Contra Costa Cy. Dep't of Social Servs.,* 812 F.2d 1154 (9th Cir.), *cert. denied,* 484 U.S. 829 (1987) (majority opinion, at 609, 613, 614, and 615) which in fact afforded absolute immunity for some acts and qualified immunity for other acts but upheld the trial court's summary dismissal based upon both absolute and qualified immunity. In discussing the practical usefulness of a qualified immunity, the United States Supreme Court has held that a denial of a claim of qualified immunity is an appealable final decision because qualified immunity, like absolute immunity, is an entitlement not to stand trial under certain conditions. Such "entitlement is an *immunity from suit* rather than a mere defense to liability; and like an absolute immunity, it is effectively lost if a case is erroneously permitted to go to trial." *Mitchell v. Forsyth,* 472 U.S. 511, 526, 86 L. Ed. 2d 411, 105 S. Ct. 2806 (1985). *See also Russell v. Hardin,* 879 F.2d 417, 420 (8th Cir. 1989).

In light of the above authority, relied upon by the majority, I think it is incumbent upon the majority to explain to the trial court whether and under what circumstances a qualified immunity will support a summary judgment. I assume in the absence of such guidance that the trial court must analogize to the case law cited by the majority and

conclude that this grant of qualified immunity allows caseworkers to seek and obtain summary judgment on liability.

Under the majority's definition of qualified immunity, I fail to see why some lawsuits against caseworkers could not be disposed of by summary judgment. According to the majority, a caseworker must (1) carry out a statutory duty, (2) according to procedures dictated by statute and superiors and (3) act reasonably. I would think that in most cases if caseworkers carried out a statutory duty according to procedures dictated by statutes and superiors they would *thereby* necessarily be acting "reasonably". The first two inquiries should normally be amenable to disposition by summary judgment.

## V
### DSHS IMMUNITY

While the majority's purported "qualified immunity" to caseworkers is illusory, it affords *no immunity whatsoever* to DSHS. The majority opinion relies upon authority from other jurisdictions to conclude that any immunity afforded to a caseworker is not extended to his or her employer (DSHS in this case). Majority opinion, at 619–22. In this regard, the majority states:

> Accordingly, the immunities of governmental officials do not shield the governments which employ them from tort liability, *even when liability is predicated upon respondeat superior.*

(Italics mine.) Majority opinion, at 620. That is simply *not* the law in Washington. The very immunity which the majority purports to extend to the caseworkers (that of police officers) does indeed extend to their employers. *Guffey v. State,* 103 Wn.2d 144, 153, 690 P.2d 1163 (1984) made this as clear as words can do when it held as follows:

> In *Nyman v. MacRae Bros. Constr. Co.,* 69 Wn.2d 285, 287, 418 P.2d 253 (1966), citing Restatement (Second) of Agency § 217B(2) (1958) and Restatement (Second) of Torts § 883, comment *b,* illustration 4 (1939), we held that *there can be no liability as a master unless the servant is liable.* Therefore, under the theory of respondeat superior, the only theory asserted in trial, the State and State Patrol cannot be held liable.

(Italics mine.) *See also Spurrell v. Block,* 40 Wn. App. 854, 869, 701 P.2d 529 (a finding of a police officer's qualified immunity precludes a finding that the employer is liable when liability is based on respondeat superior), *review denied,* 104 Wn.2d 1014 (1985); *Frost v. Walla Walla,* 106 Wn.2d 669, 673–75, 724 P.2d 1017 (1986) (the statutory immunity accorded to police officers runs also to the jurisdiction employing them, as otherwise the goal of unhampered police work would be unduly restricted).

Furthermore, in this state, prosecutorial immunity not only protects the prosecutor individually but also immunizes the county or state for which that prosecutor works.[31] In *Creelman v. Svenning,* 67 Wn.2d 882, 410 P.2d 606 (1966), this court addressed this issue, holding as follows:

> The plaintiff–appellant urges that, though the individual official may be immune from civil action, the state and the county, in light of the abrogation of sovereign immunity, should not share his immunity.
>
> This contention is bolstered by citing 4 Restatement, Torts § 880, which states that the immunity of one of two or more persons, who would otherwise be liable for a harm, does not bar recovery against the others. This rule, however, applies only in situations where policy reasons dictate that one of the parties be immune—policy reasons which do not operate as to the other.
>
> *The public policy which requires immunity for the prosecuting attorney, also requires immunity for both the state and the county for acts of judicial and quasi–judicial officers in*

---

[31]*Creelman v. Svenning,* 67 Wn.2d 882, 885, 410 P.2d 606 (1966) (the objectives for granting immunity would be destroyed if the prosecutor needed to be concerned with potential tort litigation against the county or state each time a prosecutorial decision was made); *Collins v. King Cy.,* 49 Wn. App. 264, 271, 742 P.2d 185 (1987) (absolute immunity enjoyed by prosecuting attorneys applies to the government entity under which they work and to the workers they employ); *Kuchenreuther v. Whatcom Cy.,* 24 Wn. App. 716, 718, 604 P.2d 499 (1979) (county is also immune from liability for acts of its prosecuting attorney in the performance of his duties); *Frost v. Walla Walla,* 106 Wn.2d 669, 673, 724 P.2d 1017 (1986) (the public policy objectives sought by immunity to an individual prosecutor would be seriously impaired or destroyed if immunity for the prosecutor's acts did not extend to the state and county); *Coffel v. Clallam Cy.,* 47 Wn. App. 397, 402, 735 P.2d 686 (1987).

*the performance of the duties which rest upon them; other-wise, the objectives sought by immunity to the individual offi-cers would be seriously impaired or destroyed. If the prosecutor must weigh the possibilities of precipitating tort litigation involving the county and the state against his action in any criminal case, his freedom and independence in pro-ceeding with criminal prosecutions will be at an end.*

(Footnote omitted. Italics mine.) *Creelman,* 67 Wn.2d at 885. The same public policy rationale applies to child pro-tective service caseworkers and DSHS.

I would thus hold that to the extent that liability of DSHS is predicated upon actions of its caseworkers who are afforded immunity (whether quasi–prosecutorial, witness, statutory or qualified), DSHS as the employer, under a respondeat superior theory, would also not be liable.

I do, however, agree with the majority that if there is a valid cognizable cause of action directly against DSHS for its own actions, then the individual caseworker's immunity would be irrelevant to DSHS' potential liability. DSHS has the responsibility to develop procedures which will gather information reasonably necessary to see to it that the chil-dren it places are placed in safe environments. It also has the responsibility to reasonably supervise and train its employees. To the extent that DSHS may have breached such duties, I would hold that it is not immune from civil liability to those injured as a result of such breaches.

VI

REGARDING THE MAJORITY'S ASSUMPTION THAT
A "PRIOR" COURT ORDER WAS NEEDED FOR
ONE OF THE PLACEMENTS
IN QUESTION

In reviewing DSHS's potential liability in this case, it is also necessary to comment on one important assumption made by the majority which, to my view, is not supported by either law or fact. The majority opinion implies that DSHS and its caseworkers acted in violation of statute or policy when it placed the Babcock girls with the Long girls in the Michael home and did not obtain a court order for

this placement until 2 weeks later. Majority opinion, at 610. The record before us is not at all clear that this is so. The majority cites no authority, case law, statutes or regulations for the proposition that DSHS needed a prior court order to change foster care placement from one relative's home to another relative's home.

The Louisiana court, from whence this case originally came, had declared the four girls in need of care, assumed control over them and placed them temporarily in the senior Babcocks' home in this state. This appears to be simply a foster care placement in a relative's home. There was no termination of parental rights. Jurisdiction was then accepted by the State of Washington and our state's DSHS assumed control over the girls. No permanent placement decision was as yet called for.[32]

After Rudolph Babcock illegally took the Babcock girls from his parents' home and left the state, the Long girls were placed, pursuant to court order, with their maternal aunt and uncle (the Michaels). The senior Babcocks were not relatives of the Long girls and their biological father agreed with the court order to place them in the Michaels' home. When the Babcock girls were returned by DSHS to Washington, they were placed with their half sisters in their aunt and uncle's home. In a contested court proceeding approximately 2 weeks later, the court approved this foster care placement. This was simply a change in foster care from their paternal grandparents' home to their maternal aunt and uncle's home. If the majority is indicating that this change necessarily had to be preceded by a court order, I disagree and I would remand to the trial court to make this determination in light of statutes, DSHS regulations and policies existing at the time of that placement.

---

[32]*In re Coverdell*, 30 Wn. App. 677, 679–80, 637 P.2d 991 (1981) (noting that in a dependency phase, initial attempts to reconstruct the family unit occur and only if those efforts fail is a hearing held to terminate parental rights and make *disposition* of the children), *review denied*, 97 Wn.2d 1007 (1982); RCW 13.34-.120, .180.

## VII
### Regarding Chief Justice Dore's Dissent

Although I fully concur in the concern of Chief Justice Dore in his separate dissent, as to the ability of caseworkers and child protective services to function if not afforded any immunity, I cannot agree with his reasoning.

First, the determination of negligence, which the dissent appears to make, is *not* an appellate decision here. Insofar as the dissent concludes that the parties are not negligent, it invades the province of the factfinder. In any event, to the extent that absolute immunity would be afforded under Chief Justice Dore's analysis, negligence would be irrelevant as immunity would protect the immune defendant from liability even if he or she may have been negligent to some degree. The factual determination of negligence, or the lack thereof, leaves the case once the court determines a defendant is afforded immunity for the conduct claimed to have been negligent.

Second, the dissent confuses the doctrine of immunity and the public duty doctrine. The latter asks whether a duty was owed by a public entity to a particular plaintiff. Assuming a duty was owed, the immunity issue then becomes whether the defendant should nonetheless be immune from liability. The public duty doctrine is irrelevant to this case since anytime the State assumes a parens patriae role over a minor child, then by definition, it owes a duty to that child.

As I analyze the case before us, it is about immunities and the scope of those immunities; the case is not about whether a duty was owed to these children. I thus feel that the dissent's discussion confuses the concept of duty (one of the elements of a negligence cause of action) with the concept of immunity. To bring the public duty doctrine into discussion serves no purpose but to impart another layer of confusion to an already confusing area of the law. Whether a duty does or does not exist is irrelevant if a defendant is immune from liability for reasons of public policy.

## VIII

### CONCLUSION

I am persuaded that if we afford no immunity to case-workers, and if we hold child protective service caseworkers personally liable for mistakes of any kind they might make in placing a child, the system will cease to function in a way that serves the best interests of the children of this state. One of my very real concerns is that the Eli Creekmores[33] of tomorrow will be left in unsafe homes to suffer untold miseries. It can reasonably be assumed that as a result of the majority's decision herein which grants, at best, a purely illusory immunity, DSHS caseworkers will henceforth be tempted to take the actions least likely to result in a lawsuit against them, regardless of what their best judgment call is under the facts known to them at the time action is needed. Under the doctrine enunciated by the majority opinion today, the future is fraught with the possibility of manifold tragedies.

To hold DSHS (the State) liable is one thing; it is equivalent to holding ourselves and all of our state taxpaying society liable. But to impose civil liability on a caseworker who has acted according to statute and in utmost good faith, in a way which that caseworker genuinely believed to be in the best interests of the child, is both unfair and counterproductive to the safety of dependent children.

*In sum,* I would hold as follows.

*With regard to caseworkers,* I would accord and apply the following: (1) quasi–prosecutorial absolute immunity for functions which are essentially prosecutorial in nature (actions connected with the initiation of, or pursuit of, dependency or dependency review proceedings) and quasi–judicial immunity when they act pursuant to court order following an adversarial proceeding; (2) absolute witness

---

[33]*See State v. Creekmore,* 55 Wn. App. 852, 783 P.2d 1068 (1989), *review denied,* 114 Wn.2d 1020 (1990).

immunity for their testimony in contested court proceedings, reports prepared for such proceedings and investigatory work directly related to that court reporting function; and (3) qualified immunity when not functioning in the prosecutorial or witness roles or under court order, and which immunity would afford protection so long as they substantially complied with statutes and DSHS regulations and acted in good faith.

*With regard to DSHS,* I would accord and apply immunity for actions of its employees when its liability is premised on actions of those DSHS employees which are themselves immune, but I would not accord immunity for the direct actions of DSHS which are negligent and based upon failure to have reasonable guidelines for their employees or for failure to reasonably supervise or train those employees.

Accordingly, I would reverse the summary judgment entered by the trial court and remand the case for further proceedings in accordance with the principles of law enunciated herein, and for a determination of whether or not there is a triable issue as to the caseworkers' and/or the State's allegedly negligent conduct.

DOLLIVER and DURHAM, JJ., concur with ANDERSEN, J.

DORE, C.J.—I dissent. The majority opinion holds that DSHS caseworkers can be sued for negligence in any case where a party alleges negligence and can show some omission or mistake in their testimony or case study reports which are submitted to the courts in custody proceedings. The devastating impact of turning each one of these administrative matters into a court case would cripple the already overwhelmed caseworker system. Current DSHS statistics show that there are an estimated 850 caseworkers addressing children's matters and approximately 25,000 to 27,000 children to monitor.

MISLEADING AND PREJUDICIALLY FALSE REPRESENTATION
OF MICHAEL'S CRIMINAL RECORD

The majority's opinion states that:

In preparing this document [the Court Summary and Agency Plan], Tyler never asked anyone whether Michael had a criminal background. In fact, Michael had a criminal record dating back to 1967 which included charges of forcible rape, sexual assault, and attempted rape.

Majority opinion, at 601. The record actually shows that Mr. Michael (the husband of the girls' maternal aunt) had the following criminal involvement:

1967—Michael pleaded guilty to one count of robbery while "not armed with a dangerous weapon". Clerk's Papers, at 1641–42, 1644, 1652, 1829. Deposition of Michael.

1968—Michael "ran up" a string of DWI's. Clerk's Papers, at 1656, 1700. Deposition of Michael.

1975—Michael charged with one count of forcible rape of a woman he met in a bar. He was acquitted of the forcible rape charge in 1975. Clerk's Papers, at 1700, 1702, 1708. Deposition of Michael.

1979—Michael charged with sexual assault and attempted rape of a woman acquaintance. The State *dropped* the assault and rape charges. Clerk's Papers, at 1709–11, 1713. Deposition of Michael.

Mr. Michael acknowledged the past criminal charges, explained the resolution of those charges, and confirmed the burglary and DWI convictions that comprise his criminal history after criminal charges were filed against him, when deposed during discovery, before his trial. See discussion above.

There is no statutory definition of the term "criminal record" as used by the majority. The term "criminal history", as defined by Washington statutory and case law, includes only a defendant's convictions, not crimes with which the defendant was charged, but then acquitted, or charges that were dismissed. *State v. Bartholomew,* 98 Wn.2d 173, 196–97, 654 P.2d 1170 (1982), *State's cert. granted, judgment vacated and remanded,* 463 U.S. 1203, *defendant's cert. denied,* 463 U.S. 1212 (1983), *conviction*

*aff'd on remand,* 101 Wn.2d 631, 683 P.2d 1079 (1984); *State v. Adcock,* 36 Wn. App. 699, 703, 676 P.2d 1040, *review denied,* 101 Wn. 2d 1018 (1984); RCW 9.94A.030; RCW 13.40.020(6)(a), (b).

Under the reasoning in *Bartholomew* and *Adcock,* Michael's "criminal record" includes only the robbery and the DWI charges, it *does not include the rape or assault charges.* The majority's failure to present the resolution of the sexual offense charges, at best, is misleading. The omission clearly suggests that defendant was convicted of the sexual offenses, and it is highly prejudicial to the caseworkers and DSHS in this case. Absent the "criminal record" of sexual offenses upon which the majority relies heavily, the allegations of negligence in this case do not amount to much. Had the caseworkers asked Michael in 1981 if he had ever been convicted of a crime, Michael truthfully could have answered "yes", he was convicted of robbery more than 13 years before and of traffic offenses, but no sexual offenses.

MAJORITY OPINION POTENTIALLY EXPOSES CASEWORKERS
TO RUINOUS LAWSUITS FOR ANY MISTAKE

The majority's ruling exposes caseworkers to financially devastating litigation. Today, caseworkers are severely overburdened by heavy caseloads and often are responsible for monitoring children living in hazardous home environments with physically abusive and/or drug dependent parents. Absent immunity, caseworkers faced with the difficult decision of removing an abused or neglected child from such a home will be reluctant to act out of fear of being sued. Theoretically, the majority opinion would expose 850 caseworkers to some 27,000 lawsuits. To deny caseworkers quasi–judicial and quasi–prosecutorial immunity would be irresponsible and, in my opinion, would ultimately result in the destruction of the caseworker system.

I would hold that caseworkers are entitled to quasi–judicial and quasi–prosecutorial immunity in testifying before courts and/or in preparing reports and making recommendations to the courts on custodial matters. This immunity would not apply if the caseworkers become aware

of information detrimental to custody and fail to make this information available. In the subject case there is a total lack of any evidence that the caseworkers were aware of Michael's criminal activities. If they were and they failed to make that information available in their reports then they could be sued for damages under the exception to the public duty doctrine set forth in *Bailey v. Forks*, 108 Wn.2d 262, 737 P.2d 1257, 753 P.2d 523 (1987), where a police officer saw a man he knew to be intoxicated driving a truck and he took no steps to stop him. In *Bailey*, it was foreseeable that the driver in all probability would seriously injure someone, and the general duty of the police was turned into a special duty owed to the injured victims. That is not the case here as the caseworkers had no prior knowledge at any time of Michael's criminal record.

In the subject case, absent any evidence that the caseworkers knew of Michael's criminal record and failed to disclose it, the caseworkers are entitled to quasi–judicial and quasi–prosecutorial immunity in the plaintiffs' cause of action.

### Summary Judgment

When bringing a motion for summary judgment the moving party bears the initial burden of showing an absence of an issue of material fact. *Hines v. Data Line Sys., Inc.*, 114 Wn.2d 127, 148, 787 P.2d 8 (1990). If the defendant moves for summary judgment and makes this initial showing, the inquiry then shifts to the party bearing the burden of proof at trial. *Young v. Key Pharmaceuticals, Inc.*, 112 Wn.2d 216, 225, 770 P.2d 182 (1989). If the nonmoving party fails to make a showing sufficient to establish the existence of an element essential to his case then the trial court should grant the motion. *Hines,* 114 Wn.2d at 148. In responding to the motion, the nonmoving party cannot simply rely upon the allegations set forth in its pleadings. CR 56(e) provides that the response, "by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." The trial court then views all evidence and all reasonable inferences therefrom in the light most favorable to

the nonmoving party. *Young,* 112 Wn.2d at 226. On appeal, the reviewing court places itself in the position of the trial court and considers the facts in the light most favorable to the nonmoving party. *Del Guzzi Constr. Co. v. Global Northwest Ltd.,* 105 Wn.2d 878, 889, 719 P.2d 120 (1986).

The majority asserts that *Babcock v. State,* 112 Wn.2d 83, 768 P.2d 481 (1989) (*Babcock* I) erroneously presented the undisputed facts in the light most favorable to the moving party. Majority, at 599. However, viewing the facts in the light most favorable to the nonmoving party does not mean treating the allegations of that party as proven facts as the majority does in this case. The plaintiffs' complaint states that Aryn and Angela *allegedly* ran away prompting their removal from the senior Babcocks' home. Clerk's Papers, at 3733, 3734. The majority accepts as true the plaintiffs' assertion that the girls had not run away from home but, *rather,* DSHS had concocted that story as a pretext for removing the girls. See majority, at 600 n.2. The majority fails to acknowledge that at the hearing on defendants' motion for summary judgment before Judge Staples the attorney seeking to represent the girls, Robert Crotty, specifically stated that both girls *had, in fact,* run away at the times stated by the defendants.[34]

Furthermore, the majority misconstrues the evidence in order to support its resolution of the case. The majority states that "On October 16, 1981, DSHS again took Aryn from her grandparents' home with Michael's assistance. Clerk's Papers, at 3395, Admission 17." Majority, at 600. The majority takes great liberty with the language of the

---

[34]While addressing the court on behalf of the girls, Crotty stated

Actually, the first time—the first runaway was Aryn. . . .

Well, after Aryn's first runaway, Your Honor, which occurred in October of 1981, . . ..

. . . .

Well, Aryn runs away again a second time. . . .

In December, 1981, Angela runs away the first time. . . .

Report of Proceedings, at 70, 71 (Oct. 1, 1986). Crotty's statements were not cast in terms of allegations that the girls ran away, rather he was simply restating the facts to the court.

admission cited for support of that proposition. Request for Admission 17 asked

On or about October 15, 1981, the DSHS assumed physical control of Aryn Long.

RESPONSE: Admitted that DSHS assumed physical custody of Aryn Long on 10/16/81.

Clerk's Papers, at 3395. The majority has decided that not only did DSHS take Aryn from her grandparents' home, but that Lee Michael assisted DSHS in that activity. Is this a "reasonable inference" for the court to draw from the evidence before it? While the majority purports to adhere to the standard for reviewing a motion for summary judgment, it clearly exceeds those rules by characterizing the facts in the light most favorable to bolster *its* determination of the case.

### CASEWORKER IMMUNITY

Regardless of the existence of disputed facts, the issue of immunity from suit is a threshold inquiry which should be decided at the earliest possible stage of litigation. *Anderson v. Creighton,* 483 U.S. 635, 646 n.6, 97 L. Ed. 2d 523, 107 S. Ct. 3034 (1987); *Nieto v. San Perlita Indep. Sch. Dist.,* 894 F.2d 174, 177 (5th Cir. 1990). Although there is case law to the contrary, I would hold that caseworkers are entitled to quasi–judicial and quasi–prosecutorial immunity in testifying before the court, preparing reports and making placement recommendations to the courts on custodial matters. Further, I believe the Ninth Circuit's decision in the plaintiffs' federal suit represents a well–reasoned approach when addressing the issue of caseworker immunity. *See Babcock v. Tyler,* 884 F.2d 497 (9th Cir. 1989) *(Babcock II), cert. denied,* 110 S. Ct. 1118 (1990). Therefore, I would hold that the caseworkers are entitled to quasi–judicial and quasi-prosecutorial immunity and affirm the trial court's order granting summary judgment in favor of the defendants.

In *Bruce v. Byrne–Stevens & Assocs. Eng'rs, Inc.,* 113 Wn.2d 123, 776 P.2d 666 (1989), we held that an engineer who testified as an expert witness on behalf of respondents at a previous trial was entitled to immunity from suit based

on his testimony. The client had sued the engineer alleging that the cost of restoring lateral support later proved to be double the amount of the engineer's estimate. They alleged he was negligent in preparing his analysis and testimony and that, but for his low estimate of the cost of restoring lateral support, they could have obtained judgment against the defendant for the true cost of restoration. In *Byrne–Stevens*, we stated:

> As a general rule, witnesses in judicial proceedings are absolutely immune from suit based on their testimony.
>
> . . . .
>
> . . . Guardians, therapists and attorneys who submit reports to family court are absolutely immune. *Myers v. Morris,* 810 F.2d 1437, 1466 (8th Cir.), *cert. denied,* 484 U.S. 828 (1987). Probation officers who allegedly include false statements in pretrial bond reports have been held immune. *Tripati v. United States Immigration & Naturalization Serv.,* 784 F.2d 345, 348 (10th Cir. 1986), *cert. denied,* 484 U.S. 1028 (1988).
>
> . . . .
>
> . . . However, the rationale behind quasi–judicial immunity, as set out in *Briscoe* [*v. LaHue,* 460 U.S. 325, 75 L. Ed. 2d 96, 103 S. Ct. 1108 (1983)], sweeps more broadly. The purpose of granting immunity to participants in judicial proceedings is to preserve and enhance the judicial process. "The central focus of our analysis has been the nature of the judicial proceeding itself." *Briscoe,* 460 U.S. at 334. The various grants of immunity for judges and witnesses, as well as for prosecutors and bailiffs, are all particular applications of this central policy. They are best described as instances of a single immunity for participants in judicial proceedings.

(Footnote omitted.) *Bruce v. Byrne–Stevens & Assocs. Eng'rs, Inc.,* 113 Wn.2d at 125, 127–28. If, as a matter of public policy, this court extended an engineer witness immunity, how much more important is it to give quasi–judicial immunity to state caseworkers investigating custody matters.

Addressing the plaintiffs' 42 U.S.C. § 1983 claim, which concerned the same allegedly negligent conduct by the caseworkers raised in state court, the Ninth Circuit recently held that the individual caseworkers were absolutely

immune from suit (under section 1983). *Babcock,* 884 F.2d at 504. The court related

> Absolute immunity from liability under 42 U.S.C. § 1983 has been accorded state employees responsible for the prosecution of child neglect and delinquency petitions, the guardian ad litem who serves as an advocate for the children in such proceedings, and psychologists and psychiatrists who provide information and findings for use in the proceedings by the State Department of Social Services. *Kurzawa v. Mueller,* 732 F.2d 1456, 1458 (6th Cir. 1984). Such persons are accorded absolute immunity because their participation in the court proceedings is an integral part of the judicial process. *Id. See also Briscoe v. LaHue,* 460 U.S. 325, 345–46, 103 S.Ct. 1108, 1120–21, 75 L.Ed.2d 96 [(1983)] (police officer as witness). . . . Thus, the crucial inquiry in resolving a claim of absolute immunity is whether the function for which immunity is claimed is so much an integral part of the judicial process that to deny immunity would disserve the broader public interest in having participants such as judges, advocates and witnesses perform their respective functions without fear of having to defend their actions in a civil lawsuit. *See Butz* [*v. Economou,* 438 U.S. 478, 512, 57 L. Ed. 2d 895, 98 S. Ct. 2894 (1978)].

(Citation omitted.) *Babcock,* 884 F.2d at 501–02.

The court rejected the plaintiffs' argument that the involvement of the caseworkers occurred during the post-adjudicatory phase of the dependency proceedings and constituted merely administrative or ministerial functions. *Babcock,* 884 F.2d at 502–03. The court stated

> Dependency proceedings include post–adjudication activities as well as acts by which the proceedings are initiated. *See Meyers* [*v. Contra Costa Cy. Dep't of Social Servs.,* 812 F.2d 1154, 1157 (9th Cir.), *cert. denied,* 484 U.S. 829 (1987)]. The reason for this is apparent. Caseworkers' duties do not end with the adjudication of child dependency. Depending on state law, caseworkers will have various statutory duties to perform during the time between the initial adjudication of dependency and final disposition of a case. *See* R.C.W. 13.34.120 (1983). In Washington, the dependency process does not end until six months after the dependent child returns home. R.C.W. 13.34-.130 (1983). Throughout this process, caseworkers need to exercise independent judgment in fulfilling their post–adjudication duties.

*Babcock,* 884 F.2d at 503. Extending absolute immunity to the individual defendants when carrying out their postadjudicatory duties the Ninth Circuit held that

The fear of financially devastating litigation would compromise caseworkers' judgment during this phase of the proceedings and would deprive the court of information it needs to make an informed decision, *Meyers,* 812 F.2d at 1157. There is little sense in granting immunity up through adjudication of dependency, and then exposing caseworkers to liability for services performed in monitoring child placement and custody decisions pursuant to court orders. These post–adjudication actions by social caseworkers may or may not be prosecutorial in nature. *See Coverdell [v. Department of Social & Health Servs.,* 834 F.2d 758, 764 (9th Cir. 1987)]; *cf. Meyers,* 812 F.2d at 1156. In any event, however, all of Tyler's and Bronson's actions of which the plaintiffs complain were taken in connection with, and incident to, ongoing child dependency proceedings. Whether their immunity is characterized as quasi–prosecutorial or as quasi–judicial, *see Coverdell,* 834 F.2d at 765, Tyler and Bronson are entitled to absolute immunity.

884 F.2d at 503.

Several federal courts recognize absolute immunity for social service caseworkers performing quasi–prosecutorial functions related to the initiation and pursuit of child dependency proceedings. *See Meyers v. Contra Costa Cy. Dep't of Social Servs.,* 812 F.2d 1154, 1157 (9th Cir.) (extended absolute immunity to social service caseworkers participating in the initiation and pursuit of child dependency proceedings), *cert. denied,* 484 U.S. 829 (1987); *Coverdell v. Department of Social & Health Servs.,* 834 F.2d 758, 764 (9th Cir. 1987) (absolute immunity for caseworker obtaining and executing a court order for seizure and placement of a newborn); *Kurzawa v. Mueller,* 732 F.2d 1456, 1458 (6th Cir. 1984) (state social service employees responsible for prosecution of child neglect and delinquency petitions in state court perform functions comparable to a prosecutor, entitling them to absolute immunity from liability for damages under section 1983); *Mazor v. Shelton,* 637 F. Supp. 330, 334–35 (N.D. Cal. 1986) (acts of county social service worker in removing child from custody of mother and temporarily placing child with adoptive father merit absolute immunity; "role of a social worker in the care of minors is sufficiently analogous to the role of a prosecutor to warrant absolute immunity");

*Hennessey v. Washington,* 627 F. Supp. 137, 140 (E.D. Wash. 1985) (social service caseworker who allegedly used false and misleading information to cause county prosecutor to initiate child dependency proceedings was absolutely immune from damages liability under section 1983); *Pepper v. Alexander,* 599 F. Supp. 523, 526 (D.N.M. 1984) (state Department of Human Services employees absolutely immune from damage liability under section 1983 for their decision to file petition for termination of parental rights and for their participation in that proceeding); *Whelehan v. County of Monroe,* 558 F. Supp. 1093, 1098 (W.D.N.Y. 1983) (employees of county Department of Social Services sued under section 1983, for alleged malicious prosecution of child protective proceedings, entitled to absolute immunity; "roles of the employees of the Department are sufficiently like the role of a prosecutor to warrant coverage by absolute immunity . . .").

### STATE OF LOUISIANA DEPENDENCY JUDGMENT

In the subject case, the Louisiana court made the initial determination of the dependency of the Long and Babcock girls and placed the children in the elder Babcocks' home in Washington. Pursuant to the Louisiana court's order of dependency, the Louisiana Department of Health and Human Resources transferred the case to Washington State and the Washington court accepted jurisdiction. With the girls living in this state, the Washington DSHS took responsibility for the Long/Babcock case and assigned a caseworker to monitor the girls' dependent status.

The record here established that the actions of the caseworkers assigned to the case were taken in pursuit of child dependency proceedings. The DSHS Service Episode Record, in which Tyler and Bronson recorded their notes regarding the case, revealed that the caseworkers conducted several interviews with the Babcocks, the Michaels, the children and others. The Service Episode Record also established that the caseworkers conducted home studies on the Babcocks and the Michaels and gathered extensive

information relevant to the placement of the girls. Based upon the information collected, the caseworkers made recommendations regarding the placement of the children and caseworker Bronson, acting on behalf of DSHS, testified as to that evidence before the juvenile court. The trial judge, based on such information and other evidence developed in open court, made the final decision on custody. The judge need not have followed DSHS' recommendation.

Although the actual determination of the girls' dependency occurred months earlier in Louisiana, Washington DSHS caseworkers Tyler and Bronson were actively engaged in pursuing the dependency ruling once the case was transferred to this State. The dependency process in Washington does not end until 6 months after the dependent child returns home. RCW 13.34.130. The record shows that several hearings were held before the juvenile court to determine if the children should be returned to the custody of Rudolph Babcock. The court refused to order that Rudolph Babcock be given custody of the girls and consequently their dependent status did not change. As found by the Ninth Circuit, "all of Tyler's and Bronson's actions of which the plaintiffs complain were taken in connection with, and incident to, ongoing child dependency proceedings" entitling the caseworkers to the protection of absolute immunity. *Babcock,* 884 F.2d at 503. Therefore, I would dismiss the plaintiffs' suit against the individual defendants.

### TYLER WAS NOT NEGLIGENT IN CONDUCTING THE MICHAEL HOME STUDY

The plaintiffs' claim of negligence against caseworker Tyler and DSHS centers on the investigation of the Michaels as potential foster parents. When conducting the home study of the Michaels, Tyler used an "Adoption Application" form which contained a question regarding the criminal history of the party being investigated as a prospective *adoptive parent*. Since Tyler was investigating the Michaels for the purpose of serving as *foster parents,*

she did not ask that question. The plaintiffs allege that Tyler's failure to inquire into Lee Michael's criminal background constituted negligent investigation of a foster home. According to the plaintiffs, had Tyler asked that question and received information concerning Lee Michael's criminal history, Tyler would not have recommended the placement that resulted in the sexual abuse of the minor plaintiffs.

Tyler was not negligent for her failure to inquire into Lee Michael's criminal history. When conducting the home study of the Michaels as potential foster parents, she used the incorrect form which contained the criminal background question. Had she used the correct form, it would not have had that question as it was not standard DSHS policy at that time to investigate the criminal background of prospective foster parents. By not asking the criminal background question, Tyler's actions were compatible with using the proper form as prescribed by DSHS and did not constitute negligence.

### DSHS Was Not Negligent

The plaintiffs allege negligence on the part of DSHS for its failure to establish proper hiring, training, promotion and supervision standards for its caseworkers. Essentially, the plaintiffs' claim centers on DSHS' failure to discover Lee Michael's criminal background. Had DSHS required its caseworkers to inquire into the criminal history of potential foster parents, DSHS might have discovered Lee Michael's criminal record and the caseworker, if such discovery had been made, would not have recommended that the court place the girls in the Michael home.

A. DSHS policy did not require a criminal background check.

At the time caseworker Tyler conducted the home study of the Michaels, it was not standard DSHS policy to investigate as a matter of routine any prior arrests or convictions of individuals seeking to serve as foster parents. The statute in force at the time this cause of action arose *did not*

*require* DSHS to conduct a criminal background investigation of an individual acting as a foster parent prior to placing the child in that foster home. *See* former RCW 74.15.030; Laws of 1980, ch. 125, § 1, p. 387. The statute did require the secretary of DSHS to investigate the criminal record of each *agency* and its staff seeking licensure as a foster–family home. Former RCW 74.15.030 provided in part:

> The secretary shall have the power and it shall be his duty:
>
> . . . .
>
> (2) In consultation with the child welfare and day care advisory committee, and with the advice and assistance of persons representative of the various type agencies to be licensed, to adopt and publish minimum requirements for licensing applicable to each of the various categories of agencies to be licensed.
>
> The minimum requirements shall be limited to:
>
> . . . .
>
> (b) The character, suitability and competence of an agency and other persons associated with an agency directly responsible for the care and treatment of children, expectant mothers or developmentally disabled persons. In investigating the character of an agency and the persons employed by or under contract to an agency, the secretary may have access to conviction records or pending charges of the agencies [*sic*] and its staff. The secretary shall use the information solely for the purpose of determining eligibility for a license and shall safeguard the information in the same manner as the child abuse registry established in RCW 26.44.070. Criminal justice agencies shall provide the secretary such information as they may have and that the secretary may require for such purpose[.]

(Underscoring omitted.) Laws of 1980, ch. 125, § 1, p. 387. Former RCW 74.15.030(2).[35] However, the statutory definition of "agency" explicitly excluded relatives. Former RCW 74.15.020 stated:

---

[35]The Legislature has amended that portion of RCW 74.15 several times since this cause of action arose. The current statute requires a criminal background check of any relative selected as a foster parent. However, that investigation need not be completed prior to placing the child in the relative's home. The most recent version of RCW 74.15.030 states:

The secretary shall have the power and it shall be the secretary's duty:

. . . .

(3) To investigate any person, including relatives by blood or marriage except for parents, for character, suitability, and competence in the care and

"Agency" shall *not* include the following:

(a) *Persons related by blood or marriage to the child,* expectant mother or developmentally disabled persons in the following degrees: Parent, grandparent, brother, sister, stepparent, stepbrother, stepsister, *uncle, aunt,* and/or first cousin[.]

(Italics mine.) Laws of 1979, ch. 155, § 83, p. 861. In the present case, Janet Michael is the natural aunt of all four of the children and, therefore, she and her then husband, Lee Michael, clearly fall within the statutory exclusion.

The reasoning behind such a legislative decision is obvious. Children adjudged dependent often suffer emotional damage from the traumatic experience of being removed from their homes and placed with strangers. Recognizing this potential harm, the Legislature seeks to place a dependent child in a familiar and comfortable environment as soon as possible after a court makes a dependency determination in order to minimize any adverse effects to the child. Relatives of the dependent child can often provide such an environment, and their relationship to the child gives a preliminary assurance that the child will be safeguarded from harm. The statutory scheme, which favors placement of dependent children with relatives, clearly reflects that legislative goal.

The statute did not specifically describe how the secretary was to proceed when placing a child in the foster home of an individual not falling under the statutory definition of agency. The Legislature left to the discretion of the secretary the method of determining the suitability of an individual selected to serve as a foster parent. Given that

---

treatment of children, expectant mothers, and developmentally disabled persons prior to authorizing that person to care for children, expectant mothers, and developmentally disabled persons. *However, if a child is placed with a relative under RCW 13.34.060 or 13.34.130, and if such relative appears otherwise suitable and competent to provide care and treatment the criminal history background check required by this section need not be completed before placement, but shall be completed as soon as possible after placement*[.]

(Italics mine.) RCW 74.15.030(3).

discretion, the secretary chose not to require an investigation of the criminal history of such foster parents.

B. The discretionary function exception applies to DSHS.

This State abolished sovereign immunity by RCW 4.96-.010. That statute provides that the State and its officers

> shall be liable for damages arising out of their tortious conduct, or the tortious conduct of their officers, agents or employees to the same extent as if they were a private person or corporation[.]

RCW 4.96.010. This court recognizes a narrow exception to that rule for discretionary acts performed at an executive level. *Chambers–Castanes v. King Cy.,* 100 Wn.2d 275, 281–83, 669 P.2d 451, 39 A.L.R.4th 671 (1983). "A governmental entity's exercise of discretionary acts at a basic policy level is immune from suit, whereas the exercise of discretionary acts at an operational level is not." *Chambers–Castanes,* 100 Wn.2d at 282. To determine whether an act falls within this exception, the court engages in a 4–part inquiry:

> (1) Does the challenged act, omission, or decision necessarily involve a basic governmental policy, program, or objective? (2) Is the questioned act, omission, or decision essential to the realization or accomplishment of that policy, program, or objective as opposed to one which would not change the course or direction of the policy, program, or objective? (3) Does the act, omission, or decision require the exercise of basic policy evaluation, judgment, and expertise on the part of the governmental agency involved? (4) Does the governmental agency involved possess the requisite constitutional, statutory, or lawful authority and duty to do or make the challenged act, omission, or decision?

*Chambers–Castanes,* 100 Wn.2d at 281 n.2 (quoting *Evangelical United Brethren Church v. State,* 67 Wn.2d 246, 255, 407 P.2d 440 (1965)). An affirmative answer to all of the questions is required to find the challenged act within the discretionary function exception. *Chambers–Castanes,* 100 Wn.2d at 281 n.2. A negative response to one or more of the questions indicates that further inquiry is necessary. *Chambers–Castanes,* 100 Wn.2d at 281 n.2.

The challenged decision at issue in this case was DSHS' method of investigating potential foster parents. The foster parent home study required at the time by DSHS did not include an inquiry into the potential foster parent's criminal history. Utilizing the discretionary function analysis, I would find that DSHS' decision not to require a criminal background check of potential foster parents constituted a discretionary act at a basic policy level which this court holds is immune from suit.

The Department's investigation of prospective foster parents necessarily involved a basic governmental program. The Legislature, seeking to provide a familiar environment for dependent children, enacted statutes governing the treatment of children found to be abused or neglected. Under those statutes, a dependent child could be placed with a foster parent following completion of a home study by DSHS. The Department's decision as to the contents of the home study was essential to the realization of the Legislature's statutory program to place dependent children in a safe and comfortable environment.

The Legislature granted the secretary of DSHS the authority to establish the standard for investigating potential foster parents, former RCW 74.15.030, and left to the discretion of the secretary the means by which DSHS would implement the Legislature's objectives. Furthermore, the Legislature left to the discretion of the secretary the promulgation of standards to utilize in the evaluation of prospective foster parents. Establishing those standards required the exercise of basic policy evaluation, judgment and expertise on the part of the secretary and DSHS. I would hold that the discretionary function exception bars plaintiffs' suit against DSHS.

CONCLUSION

I would hold quasi–judicial and quasi–prosecutorial immunity for caseworkers Tyler and Bronson and affirm the trial court summary judgment of dismissal. The caseworkers here had no prior knowledge of Michael's criminal

background of sexual assault. If they did know and failed to act by notifying their superiors or putting it in their case study, they possibly would have owed plaintiffs a special duty and an exception to the public duty doctrine would apply to establish tort liability. *Bailey v. Forks,* 108 Wn.2d 262, 737 P.2d 1257, 753 P.2d 523 (1987).

Discretionary immunity applies to DSHS unless it acts capriciously or arbitrarily. The summary judgment in favor of DSHS should be affirmed, as there is a total absence of any negligence by such agency. The procedures set up by DSHS for investigative methods for its caseworkers on custody cases was in accordance with its discretion as provided in the statute.

Reconsideration denied July 16, 1991.